MEYERS v. UNITED STATES.
No. 9797.

United States Court of Appeals
District of Columbia Circuit.

Argued June 14, 1948.

Decided Nov. 8, 1948.
Writ of Certiorari Denied Feb. 14, 1949.

See 69 S.Ct. 602.

PRETTYMAN, Circuit Judge, dissenting.

Mr. Robert T. Bushnell, of Boston, Mass., with whom Messrs. Russell Hardy and Smith W. Brookhart, both of Washington, D. C., were on the brief, for appellant.

Mr. George Morris Fay, U. S. Atty., of Washington, D. C., with whom Mr. Edward Molenof, Sp. Asst. to the Atty. Gen., and Messrs. John W. Fihelly, Sidney S. Sachs and Ross O'Donoghue, Asst. U. S. Attys., all of Washington, D. C., were on the brief, for appellee.

802

Before WILBUR K. MILLER, PRET-TYMAN and PROCTOR, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

Bleriot H. Lamarre and the appellant, Bennett E. Meyers, were jointly indicted for violating the District of Columbia statute [1] which denounces perjury and subornation thereof. Three counts of the indictment charged Lamarre with as many separate perjuries in his testimony before a subcommittee of a committee of the United States Senate constituted to investigate the national defense program, and three more counts accused Meyers of suborning the perjuries of his codefendant.

Lamarre pleaded guilty to all three charges when he was arraigned on December 19, 1947, a few days after the return of the indictment. Meyers entered a plea of not guilty and was tried before a jury in the District Court of the United States for the District of Columbia. At the conclusion of the government's evidence, he moved for a judgment of acquittal, which the court denied. Meyers did not take the stand or introduce any evidence. Having been found guilty under each of the three counts against him, he appeals.

Meyers was an officer in the United States Army. In 1939, while stationed at Wright Field, near Dayton, Ohio, he organized under the laws of Ohio a corporation called Aviation Electric Corporation, and paid into its treasury the sum of $500 to cover its authorized capital consisting of 250 shares of common stock having a par value of $2 each. At his direction, a certificate for 224 shares was issued to Miss June Ballaou, an employee at Wright Field, and the remaining shares were divided between one David Johnson and one Robert L. Pine. The newly organized company engaged in manufacturing parts and accessories for airplanes, and soon had on hand orders from the Signal Corps of the United States Army aggregating about $20,000.

The appellant had become acquainted with Lamarre and his wife as early as 1936 or 1937 and apparently was fond of them. Late in 1939, he went to see Lamarre in California, where the latter was employed by an airplane company, and suggested that he come to Dayton to become associated with Aviation Electric in an executive capacity. The invitation was accepted and in January, 1940, Lamarre was made secretary-treasurer of the corporation and the Ballaou certificate for 224 shares was transferred to him without valuable consideration. A few months thereafter he became president of the company.

From its modest beginning in 1939 the operations of Aviation Electric Corporation expanded substantially and rapidly. It obtained contracts to furnish parts to large corporations engaged in producing aircraft for the United States Army. Meyers advanced considerable sums for working capital and took therefor the company's promissory notes which were secured by the pledge and delivery to him of certificates, endorsed in blank, evidencing all its capital stock.

The appellant was transferred to Washington in 1941 and the next year became Deputy Chief of Procurement of Aircraft and Aircraft Parts for the Army Air Force. Meanwhile, Aviation Electric was operating successfully and profitably so that by the end of 1942 all Meyers' loans had been repaid. Large profits were earned as long as the war continued, but the termination of actual hostilities so reduced the demand for its products that the corporation was dissolved in September, 1946.

Desiring to ascertain whether there had been instances of waste, fraud, corruption, mismanagement, excessive profits or inefficiency in the nation's war effort, entailing as it did the hurried expenditure of billions of dollars for national defense, the United States Senate created the investigating committee to which reference has been made. In the course of an inquiry into government contracts with a large airplane supplier, the appellant testified before that committee. It developed during the hearing that Aviation Electric Corporation had been a sub-contractor on government work and that Lamarre had been its president from 1940 until its dissolution in 1946. In order to ascertain what connection, if any, the appellant had had with Aviation Electric, the subcommittee subpoenaed Lamarre, who testified on Saturday, October 4, and Monday, October 6, in 1947. That testimony

---

[1] Title 22, § 2501, D.C.Code 1940.

brought about the indictment which was the genesis of the case now before us.

Three of the indictment's counts charged that Lamarre: (1) knowingly and willfully testified falsely that Meyers "was not financially interested in or connected with the Aviation Electric Corporation of Dayton and Vandalia, Ohio," during the years 1940 to 1947, inclusive; (2) knowingly and willfully testified falsely that a Cadillac automobile purchased in Washington by Meyers, and paid for by Aviation Electric Corporation, was purchased for the corporation and for its use; (3) knowingly and willfully testified falsely that the sum of $10,-000, paid by means of Aviation Electric's checks, for decorating and furnishing Meyers' Washington apartment "was a gift from himself, Bleriot H. Lamarre."

■ Although the appellant was convicted on three counts, each of which charged him with suborning one of Lamarre's perjuries, he received only one sentence.[2] That being true, the judgment must be affirmed if appellant was properly convicted on any one of the three counts against him.[3] We shall consider, nevertheless, appellant's assignments of error with respect to all the counts.

1. *As to Meyers' financial interest in or connection with Aviation Electric Corporation.*

■ On this subject, the first count of the indictment includes the following: " * * * In the course of his [Lamarre's] testimony it became material whether Ben-

nett E. Meyers was financially interested in or connected with the Aviation Electric Corporation of Dayton and Vandalia, Ohio, during the years 1940, 1941, 1942, 1943, 1944, 1945, 1946, or 1947; and being questioned in that regard, Bleriot H. Lamarre on October 4 and October 6, 1947, and in the District of Columbia wilfully and contrary to his said oath testified falsely that Bennett E. Meyers was not financially interested in or connected with the Aviation Electric Corporation of Dayton and Vandalia, Ohio, during those years or any of them, whereas in truth, as Bleriot H. Lamarre knew, Bennet E. Meyers was financially interested in and connected with the said Aviation Electric Corporation during each and all the years 1940, 1941, 1942, 1943, 1944, 1945, 1946 and 1947."

Appellant's counsel earnestly assert and ably argue that Lamarre did not testify before the subcommittee that Meyers was not financially interested in or connected with Aviation Electric; but that, quite to the contrary, Lamarre told the subcommittee Meyers actually owned the business. If that contention be well founded, it is a complete defense to the charge that Meyers suborned the perjury alleged in the first count. It is elementary that one cannot be convicted of suborning a perjury which was not in fact committed; that is to say, there can be no subornation of perjury if there was no perjury. It is equally true that one cannot be convicted of suborning perjury if the alleged perjurious statement actually was not made by the alleged perjuror.

[2] In imposing sentence, the trial judge said: " * * * The indictment consists of three counts of subornation of perjury. The defendant was convicted on all three counts. All three counts, however, involve the same transaction, they are all part and parcel of the same transaction. In fact, it would have been possible to have embodied all the allegations in a single count, but quite properly, in the interest of lucidity and clarity, the Government framed those allegations in three separate counts. In view of the fact, however, that substantially there is just one offense, the Court is going to impose a single sentence and is not going to impose a separate sentence on the three counts."

[3] A rule frequently stated by the Supreme Court is "that a judgment upon an indictment containing several counts, with a verdict of guilty upon each, will be sustained if any count is good, and sufficient in itself to support the judgment." Whitfield v. Ohio, 297 U.S. 431, 438, 56 S.Ct. 532, 534, 80 L.Ed. 778. Claassen v. United States, 142 U.S. 140, 146, 12 S.Ct. 169, 35 L.Ed. 966; Evans v. United States, 153 U.S. 584, 595, 14 S. Ct. 934, 38 L.Ed. 830; Abrams v. United States, 250 U.S. 616, 619, 40 S.Ct. 17, 63 L.Ed. 1173; Brooks v. United States, 267 U.S. 432, 441, 45 S.Ct. 345, 69 L.Ed. 699, 37 A.L.R. 1407. See also Gibson v. United States, 80 U.S.App.D.C. 81, 84, 149 F.2d 381, 384, and cf. Kinnison v. United States, 81 U.S.App.D.C. 312, 158 F.2d 403.

■ No matter how unorthodox, unpatriotic, reprehensible or criminal the evidence may tend to show Meyers' conduct to have been, his conviction under the first count cannot stand if Lamarre did not in fact testify as the count charged that he did. So, at the threshold of our consideration of the first count, we must decide whether Lamarre in fact told the subcommittee Meyers was not financially interested in or connected with Aviation Electric. If it be found that he did so testify, then it will be pertinent to see whether the statement was true or false; and, if false, whether Meyers suborned it.

■ Whether Lamarre represented to the subcommittee that Meyers was not financially interested in or connected with the company is to be determined by finding the meaning or significance which is fairly attributable to all Lamarre's testimony before the subcommittee. A stenographically reported record of that testimony was put in evidence and is before us.

Appellant's insistence that Lamarre did not say what the first count charged him with saying, but said exactly the opposite, is based on the fact that Lamarre was asked this question, "So you understood all of the time that for all practical purposes, he [Meyers] owned the business?"; and that Lamarre answered by saying, "That is right," and then continued with other statements to that effect.

This bit of testimony, taken from its context and read without reference to or consideration of the remainder of Lamarre's evidence, supports appellant's contention that, regardless of the truth or falsity of the statement which the first count attributed to Lamarre, he simply did not say what he is alleged to have said, but definitely stated exactly the contrary. So, if Lamarre's answer to the quoted question were all he said on the subject, we should have no difficulty in accepting appellant's argument, and in holding that Lamarre did not commit the first perjury charged against him and that, therefore, Meyers was wrongly convicted of suborning it.

We turn first to the subcommittee counsel's examination of Lamarre, in the course of which he made the statement upon which appellant now relies as a defense to the first count, in order to see whether the context[4] of the statement limits the absolute

---

[4] The statement was made in the course of this colloquy:

"Senator Ferguson: Now, what was the agreement about the stock that was endorsed? It was Meyers' stock, there was not any doubt about that, was there?

"Mr. Lamarre: I would not say that, Senator.

"Senator Ferguson: Well, what would you say? You endorsed the certificate in blank, they endorsed theirs, and you put them there where Meyers had access to them. Now, why did you do that?

"Mr. Lamarre: The certificates were endorsed so that at any time they wanted to borrow money, they could be used for security.

* * * * * *

"Senator Ferguson: Did you borrow money on them?

"Mr. Lamarre: Yes.

"Senator Ferguson: From whom?

"Mr. Lamarre: General Meyers.

* * * * * *

"Senator Ferguson: When did you borrow the money from him and give him the certificates?

"Mr. Lamarre: In 1940.

"Senator Ferguson: How much did you borrow from him?

"Mr. Lamarre: There was over—You mean the total or just during 1940?

"Senator Ferguson: 1940, when you endorsed these certificates and gave them to General Meyers.

"Mr. Lamarre: I do not know positively at that time; it was probably $10,000.

"Senator Ferguson: All right. Now, he loaned the company $10,000, and you gave him all of the certificates as security?

"Mr. Lamarre: That is right.

"Senator Ferguson: When was that?

"Mr. Lamarre: In 1940.

"Senator Ferguson: What month in 1940?

"Mr. Lamarre: I do not know.

"Mr. Rogers: He actually had the stock certificates then, did not he, after that?

"Mr. Lamarre: Yes, at one time.

"Mr. Rogers: And how long did he keep them?

"Mr. Lamarre: Until the loan was paid off.

"Mr. Rogers: I see; when was that paid off, in 1942?

"Mr. Lamarre: It was reduced entirely in 1941, and then went back again in

meaning which it appears to have when standing alone. The setting in which the statement appears shows that in making it Lamarre was referring to the occasion in 1940 when a large part of the stock had just been transferred to him and endorsed back to Meyers to serve as collateral. It is, however, perfectly clear from the evidence as a whole that Lamarre did not intend to be understood as meaning that from 1940 until 1947 Meyers was for all practical purposes the owner of the business. For example, when Lamarre was asked, "It [the stock] belonged to Meyers all the time?", he answered, "No, sir, it did not." He was then asked, "Well, then, when did it become yours, actually yours?" and he replied, "When the notes were paid off." He added, "It had always been mine as a matter of fact."

 Even if this were not so, and if it be conceded arguendo that Lamarre unqualifiedly stated with respect to the entire period involved that Meyers had no financial interest in or connection with the corporation, it would remain true that he also later testified to the subcommittee that Meyers had no interest at any time after Lamarre's association with the company began except as a creditor, and that he ceased to have even that interest after 1942.[5] The criminal nature of perjury is not removed, the Supreme Court has said, by the fact that the perjurer later in the

proceeding states the truth; that is to say, recantation following perjury does not destroy its criminality. United States v. Norris, 1937, 300 U.S. 564, 573, 57 S.Ct. 535, 81 L.Ed. 808. We see no reason why the principle should not apply with even greater force when perjury follows truthful testimony and so is the last and unrecanted choice of its author. In the present case, even if the true statement (that Meyers was for all intents and purposes the owner of the business) be given the full implication and effect which appellant finds in it, and so be regarded as applying to all the years involved, it was followed by falsehood when Lamarre emphatically and repeatedly swore Meyers had no sort of interest in the company after 1942. His last choice was perjury.

From the quotations shown in the margin as note 3, it will be observed that, just before making the statement which appellant says absolves him, Lamarre stated, "I would not say" it was Meyers' stock. And shortly after having made the statement upon which appellant relies, Lamarre insisted that the endorsed certificates were held for Meyers only so long as the company owed him money, that he considered the stock as income to himself, that it did not belong to Meyers all the time but actually became his [Lamarre's] when the notes were paid.[6] Although he had given no consideration to Meyers or to any other person

---

1942 and borrowed some additional money from him when we needed working capital.

"Mr. Rogers: At the time the stock was transferred on the books to your name, you did not pay anything for that, did you?

"Mr. Lamarre: No.

"Mr. Rogers: That was just a bookkeeping transaction, and you held · the stock and then you endorsed them over to Meyers and he took the certificates, is that correct?

"Mr. Lamarre: Yes.

"Mr. Rogers: So you understood all of the time that for all practical purposes he owned the business, did you not?

"Mr. Lamarre: That is right.

"Mr. Rogers: He put all of the money in and he owned all of the stock?

"Mr. Lamarre: That is right.

\* \* \* \* \* \*

"Mr. Rogers: In other words, in that connection all of the arrangements as to

the stock and the transfers and how they were endorsed, that was all arranged by Meyers, was it not?

"Mr. Lamarre: Yes.

"Mr. Rogers: And the arrangements were made between you and Ballaou and Meyers, the three of you? He must have told Ballaou what to do.

"Mr. Lamarre: Yes, because she had never worked for the company actually.

"Mr. Rogers: Therefore, for all practical purposes now, to get back to my question, he was the owner of that business, was he not?

"Mr. Lamarre: You could say it that way, yes."

[5] See excerpt from evidence shown as note 6.

[6] This was demonstrated when counsel for the subcommittee called Lamarre's attention to the journal entry dated in September, 1939, showing: "Paid in capital of $500 by B. E. Meyers for subscription to 250 shares of common stock,

for the shares transferred to him at Meyers' instance, he told the senators, "It had always been mine as a matter of fact" and that he felt under no obligation to pay Meyers for it.

■ A reading of all Lamarre's testimony on the subject shows convincingly and beyond any doubt that he was trying to get the subcommittee to believe Meyers had no actual or beneficial stock ownership in the company, and that he bore to it merely the relation of creditor, a relation which ended in 1942. This is true despite the fact that he said he understood Meyers owned the company for all practical purposes. That statement may not be isolated and thereby given a meaning wholly different from the clear significance of the testimony considered as a whole. Appellant himself states the law to be that a charge of perjury "may not be sustained by the

---

par value $2, in accordance with application for charter, filed 9-13-39. * * * " The following testimony was given immediately thereafter:

"Mr. Rogers: * * * Did you know about that journal entry?

"Mr. Lamarre: Yes.

"Mr. Rogers: So you know that Meyers organized the company and took all of the shares of common stock to begin with?

"Mr. Lamarre: Yes.

"Mr. Rogers: No one ever paid him for this stock that was transferred? You did not pay him for yours?

"Mr. Lamarre: No.

"Mr. Rogers: June Ballaou never made him any payment so far as you know?

"Mr. Lamarre: No.

"Senator Ferguson: Is it not a fact, whether you like this word 'dummy' or not, that you were merely holding the stock for General Meyers, is not that a fact? When you came in, Ballaou put the shares in your name and you held them for General Meyers, and you endorsed them?

"Mr. Lamarre: No, they were held for him only so long as the company owed him money.

*　　*　　*　　*　　*　　*

"Senator Ferguson: They were in your name?

"Mr. Lamarre: That is right.

"Senator Ferguson: But the actual owner was General Meyers?

"Mr. Lamarre: Only because he had put up the money for them, and the money was to be paid back to him.

*　　*　　*　　*　　*

"Mr. Lamarre: Well, there was not much of a discussion. When I returned he told me that Ballaou was a dummy corporator and that I was to get the stock. So when it came in, I made the transfer on the books of the corporation.

"Mr. Rogers: What did you consider in your own mind, was that part of your salary, was it a gift?

"Mr. Lamarre: Well, I considered it a further income.

"Mr. Rogers: When did you report it on your income tax?

"Mr. Lamarre: I did not report it.

*　　*　　*　　*　　*　　*

"Senator Ferguson: When it [the stock] became valuable, why did you not put it in as an income? It was not an income, was it? It belonged to Meyers all of the time?

"Mr. Lamarre: No, sir, it did not.

"Senator Ferguson: Well, when did it become yours, actually yours?

"Mr. Lamarre: When the notes were paid off.

"Mr Rogers: All right, now.

"Mr. Lamarre: It had always been mine as a matter of fact.

*　　*　　*　　*　　*　　*

"Mr. Rogers: What we are talking about is 224 shares of stock; all of a sudden you got it for nothing. We want to know what you thought about it. Were you supposed to eventually pay General Meyers for it? Was it supposed to be yours then?

"Mr. Lamarre: Yes, it was supposed to, I was not supposed to pay him for it. It was supposed to be mine. As I said, he had always wanted me to, as long as I had known him, to be set up in a business of my own; and he always had high regard for me, and I had a high regard for him. And the stock, I considered that when I came in, as pretty much of an opportunity to become set up in business.

"Mr. Rogers: And you did not feel under any obligation ever to return that stock to General Meyers?

"Mr. Lamarre: No.

"Mr. Rogers: In other words, you thought it was yours, and you thought that you were the head of the company?

"Mr. Lamarre: That is right.

"Mr. Rogers: And you thought that you were the boss?

"Mr. Lamarre: I was the boss, after David E. Johnson was no longer with the company.

*　　*　　*　　*　　*　　*

"Senator Ferguson: * * * You owned this stock?

"Mr. Lamarre: That is right."

device of lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different than that which its context clearly shows." He cites Fotie v. United States, 8 Cir., 137 F.2d 831, and other cases to the same effect. The principle is sound, but has no application here. It is the appellant who seeks to sustain his defense "by the device of lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different than that which its context clearly shows." Since a charge of perjury may not be sustained in that manner, it follows corollarially that a defense to a charge of perjury may not be established in that fashion.

■ From the evidence as a whole we have no difficulty in concluding that Lamarre told, and intended to tell, the subcommittee that Meyers held no stock in the company, either actually or beneficially, after the shares were issued to Lamarre in 1940; that Meyers had no interest of any kind after that except he was a creditor and held the capital stock as collateral; and that after 1942 Meyers had no sort of interest in or connection with the company. Having so determined, it is next necessary to ascertain whether that statement was false and known to be false to Lamarre when he testified, so as to stamp it as perjury.

Not only did Lamarre plead guilty to the charge of perjury made against him because of his representation to the subcommittee that Meyers was not interested in or connected with the corporation; he also testified fully and freely at Meyers' trial that he had knowingly and willfully falsified in that respect before the subcommittee, and that in fact Meyers was at all times the real owner of the company.

Lamarre testified further at the trial that, during the years involved, his own salary as secretary and treasurer, and later as president, was fixed at sums varying from $20,000 to $30,000 per annum and that it was so shown on the books of the corporation. Company checks were regularly drawn to Lamarre's order in payment of his ostensible salary but in fact he was allowed to keep as his own only a modest compensation. By far the larger part of the salary credited to Lamarre on the books of the corporation was remitted by him to Meyers, usually in the form of cashiers' checks. A similar arrangement was followed with respect to the salary of T. E. Readnower, Lamarre's brother-in-law, whose apparent salary was $18,600, of which some $15,000 went to Meyers. By this device and other subterfuges, such as the purchase of an automobile and the furnishing of an apartment, Meyers received more than $150,000 from the company during the years involved, in addition to the repayment to him of the sums which he advanced from time to time for working capital. The checks by which Aviation Electric paid the purported salaries, and the cashiers' checks by which the money was transmitted to Meyers, were in evidence and in our view constitute sufficient corroboration of Lamarre's testimony that he testified falsely before the subcommittee.

Meyers' subornation of this perjury was proved by the evidence of Lamarre that on the day before his first appearance before the subcommittee the appellant instructed him to swear "Meyers had no financial interest or any other interest other than the money that he had loaned to the corporation and which had been repaid to him by the middle of 1942." It thus appears that, contrary to appellant's contention, the evidence showed Lamarre actually made the statements and representations to the subcommittee which the first count charged; that his testimony was false and was given knowingly and willfully; and that Meyers suborned the perjury.

2. *As to the count which charged Lamarre with perjury concerning the purchase of the Cadillac automobile.*

■ As to this count [7] the indictment charged the following: "* * * In the course of his [Lamarre's] testimony on these dates it became material whether a Cadillac automobile which he testified Bennett E. Meyers had purchased with funds of the Aviation Electric Corporation of Dayton and Vandalia, Ohio, on or about January 1, 1942, had been purchased for

---

[7] Which, for convenience, will be referred to as the "second count," "second charge," or "second perjury."

the personal use of Bennett E. Meyers or for the use of the said Corporation. The fact was, as Bleriot H. Lamarre then knew, that that automobile had been purchased for the personal use of Bennett E. Meyers. Bleriot H. Lamarre nevertheless wilfully and contrary to his said oath testified falsely before the subcommittee on the dates and at the place aforesaid that that Cadillac automobile had been purchased for the Aviation Electric Corporation and for the use of the Aviation Electric Corporation." With respect to this charge the appellant makes in his brief the following categorical comment: *"The transcript disclosed that Lamarre had given no testimony whatsoever that the car had, or had not, 'been purchased for the personal use of Bennett E. Meyers or for the use of the said Corporation.'* There is not a word in this transcript of any testimony by Lamarre, false or true, that the car referred to had been purchased for the personal use of appellant or for the use of the Corporation." A factual issue is thus raised which is to be resolved by resorting to the record.

Lamarre swore to the subcommittee that at the end of 1941 he asked General Meyers to buy an automobile for him and that Meyers did buy in Washington the Cadillac sedan; that it remained in Washington for several weeks because when he came for it the weather was bad and he was forced to return to Dayton on a train. He also testified substantially as follows: he left the car with Meyers until he later was able to transport it to Dayton, where it was used as the company car [8] by him and Curnutt, Meyers' father-in-law, who also was an Aviation Electric employee. Aviation Electric paid for the automobile and carried it on its books as an asset until 1944 or 1945, when Curnutt bought it from the company at its then book value of $1,400. The sale was made because the company had no further use for the car. It is, therefore, plain that Lamarre told the subcommittee substantially what the second count of the indictment charged.

At the trial Lamarre testified that his statements to the subcommittee were false and that in truth Meyers telephoned him from Washington and instructed him to send a company check for approximately $3,000 as he wanted to purchase a Cadillac; that the check was sent and the automobile was purchased but that the company never had possession of it.

There was ample corroboration of Lamarre's testimony that the automobile was bought for and used by Meyers. The manager of the garage at Hotel 2400, where Meyers' apartment was located, testified that early in 1942 the appellant stored in the hotel garage a new 1942 blue Cadillac which he kept there until he left on August 27, 1944. The car was kept as "live storage," meaning that it was cleaned nightly and used almost daily by Meyers or his wife. The storage was charged to Meyers and the garage manager never saw anyone drive the car other than Meyers and his wife.

Calvin Mettee, who was a corporal in the army, testified he was assigned to the appellant as a chauffeur in the spring of 1942. He told of the new blue 1942 Cadillac being in the hotel garage and that it was his duty

---

[8] The testimony concerning this was as follows:

"Mr. Rogers: He [Curnutt] bought a car from the company and gave the company a note for the car?

"Mr. Lamarre: For the car, that is right.

"Mr. Flanagan: What kind of a car was it?

"Mr. Lamarre: Cadillac.

"Mr. Flanagan: How much did it cost?

"Mr. Lamarre: The original cost was approximately $3,000.

"Mr. Flanagan: Did he [Curnutt] use that car himself?

"Mr. Lamarre: He did after he bought it.

"Mr. Flanagan: Who had it before he bought it?

"Mr. Lamarre: The company had it.

"Mr. Flanagan: It was the company car?

"Mr. Lamarre: Yes.

"Mr. Flanagan: Who used it when it was a company car?

"Mr. Lamarre: I used it.

"Mr. Flanagan: And when did he buy this car?

"Mr. Lamarre: I do not know exactly when it was; it may have been '44.

"Senator Ferguson: How much did he pay for it?

"Mr. Lamarre: Or '45. He paid book value for it, $1,400 and some."

to see that the car was clean, brushed out and ready to go at all times. During the year 1942 it was never out of the garage for longer than a week. It·bore District of Columbia license tags during 1942, 1943 and 1944. When Meyers married again in 1943, the witness was instructed to explain to Mrs. Meyers how to drive the blue Cadillac. Mrs. Meyers personally used the car in 1943 and at times the witness would drive her on shopping tours or to social functions. It was stored in the hotel garage thoughout the year 1943 and until the summer of 1944 when Meyers was transferred to Wright Field. Mettee was transferred there also. At Meyers' direction he flew in an army airplane from Dayton to Washington in order to drive the blue Cadillac to Dayton where he delivered it to Meyers' quarters. At appellant's order, he arranged for the transfer of the title of the automobile. from Curnutt to Meyers or his wife. The car was constantly in appellant's possession while at Wright Field. When Meyers retired from active service in 1945, he directed Mettee to drive the 1942 Cadillac from Dayton to his residence at Bayville, Long Island, which was done..

In the latter part of October, 1947, after Mettee had been released from the army, he went from his home in Rochester, Pennsylvania, to Huntington, New York, to see Meyers, at the latter's request. At Meyers' suggestion he registered at the hotel under an assumed name. Meyers told him that he was being investigated and that Lamarre was trying to blackmail him. He asked Mettee to testify, if he were questioned, that he had obtained from Lamarre authority to drive the blue Cadillac on the occasions when he did drive it, and to say that during the winter of 1942 and 1943 Lamarre drove the car from Dayton to Washington but due to heavy weather he could not return and was forced to leave the car in Washington, and that the witness did not know how the car was taken to Dayton. Meyers told·him that if his testimony concerning the automobile turned out to be of any value he would give him $2,000.

Proof of subornation was furnished when, with respect to a conversation between Meyers and Lamarre in a hotel lobby on October 3, 1947, Lamarre was asked,

"Was there any discussion about a Cadillac automobile?", to which he answered: "I was to say that the Cadillac automobile was purchased for the company by Meyers on my instructions and that I had gone to Washington a few weeks after the car was delivered and I had driven it back to Dayton, and that on several occasions I had driven the car to Washington, but because of bad weather I had gone back on the train and it remained here in Washington for some time and then later on when I came in again I would pick the car up and drive it home." He was then asked, "Was that the truth?", to which he replied, "No, it was not."

Our conclusion is that the second count was sustained. Lamarre testified to the subcommittee in the manner charged; his testimony was admitted by him, and otherwise proved, to be false; and evidence was introduced that Meyers suborned the perjury.

3. *As to furnishing and decorating the apartment.*

■ On this subject the pertinent portion of the indictment is as follows: " * * * In the course of his [Lamarre's] testimony on these dates it became material whether the cost of redecorating the apartment of Bennett E. Meyers at 2400 Sixteenth Street, N. W., Washington, D. C., in the year 1941, in the approximate amount of $10,000 had been paid for out of the funds of the Aviation Electric Corporation of Dayton and Vandalia, Ohio. Knowing the facts to be that it had, Bleriot H. Lamarre wilfully and contrary to his oath falsely testified before the subcommittee on the dates and at the place aforesaid that the aforesaid redecoration and cost of redecoration of the said apartment of Bennett E. Meyers was a gift from himself, Bleriot H. Lamarre."

During his appearance before the subcommittee on the morning of Saturday, October 4, 1947, Lamarre said he had never made Meyers a present of a value of more than $100 and that all gifts from him and his wife, such as those made at Christmas, amounted to no more than $400. After lunching with Meyers and one of the latter's attorneys, he volunteered at the be-

ginning of the afternoon session this statement: "There is one thing I would like to say before we proceed. That is, you laid a great deal of stress this morning on what you called gifts to General Meyers. I would like to amplify my statements on that, because at the time I did not consider it a gift, but it was after General Meyers had come to Washington, he had an apartment decorated, and I paid for the decoration of that apartment, and the furnishings." [9]

He said to the subcommittee that the cost of furnishing the apartment was paid by Aviation Electric checks, which was true; but he sought to transform the transaction from a company expenditure into a personal gift from him by belatedly charging it to his own salary account, after originally charging it to expense. It was indeed true, therefore, as he told the senators, that the checks, although drawn by the company, were charged against his personal salary.

At the trial of Meyers, Lamarre admitted the expenditure was by the company and not by him. His confession was corroborated because the essential falsity of his testimony before the subcommittee is shown in this: although bookkeeping entries were made to charge $10,000 to his salary account, that account itself was false, and fraudulently set up.

His actual and comparatively meagre salary could not cover the decorating cost.

---

[9] The following are excerpts from the cross-examination of Lamarre which followed his voluntary statement:

"Senator Ferguson: You personally?
"Mr. Lamarre: Yes. I considered it—
"Mr. Rogers: Who did you eat with this noon?
"Mr. Lamarre: General Meyers.
"Mr. Rogers: You discussed this with him, then?
"Mr. Lamarre: No, I did not.

\* \* \* \* \* \*

"Senator Ferguson: You say you made a gift of the decoration and some furniture of an apartment?
"Mr. Lamarre: Yes.
"Senator Ferguson: When was that?
"Mr. Lamarre: In 1941.
"Senator Ferguson: And you gave it to him as a personal thing from you?
"Mr. Lamarre: I considered it a moral—
"Senator Ferguson: Not what you considered it.
"Mr. Lamarre: A moral obligation. All right. I gave him, I paid for—
"Senator Ferguson: You personally?
"Mr. Lamarre: —paid for the decoration and the furnishings of that apartment.
"Mr. Rogers: Go ahead, Senator.
"Senator Ferguson: You personally paid for the decoration and the furnishings of an apartment in Washington?
"Mr. Lamarre: That is right.
"Senator Ferguson: In 1941?
"Mr. Lamarre: That is right.

\* \* \* \* \* \*

"Mr. Rogers: What did it amount to?
"Mr. Lamarre: Approximately $10,000.
"Mr. Rogers: And you claim that you forgot that this morning?
"Mr. Lamarre: As I said, I did not consider it as a gift.

"Senator Ferguson: What was it?
"Mr. Lamarre: And we were talking in terms of gifts, and when a gift, I think of some item that you give the man.
"Mr. Rogers: Let us go through the details of it again. You had a conversation, and he mentioned that he was moving.
"Mr. Lamarre: That is right.
"Mr. Rogers: And what did you say?
"Mr. Lamarre: I said that I would like to take care of the decorating expense, the furniture expense for him.
"Mr. Rogers: Yes.
"Mr. Lamarre: As more or less a return for all of the things that he had done for me in the past.

\* \* \* \* \* \*

"Mr. Lamarre: The $10,000 was charged to my salary account.
"Senator Ferguson: When?
"Mr. Lamarre: In 1941.
"Senator Ferguson: At the time you made it?
"Mr. Lamarre: No, not immediately.
"Senator Ferguson: How long afterwards?
"Mr. Lamarre: It was in December of that year.
"Senator Ferguson: Why was it charged, because the government refused to allow it?
"Mr. Lamarre: No, the government knew nothing about that.
"Senator Ferguson: Why did you change it?
"Mr. Lamarre: I felt that it was not a proper business expense and I changed it.
"Senator Ferguson: Well, now, at first you charged it up as a business expense?
"Mr. Lamarre: That is right, I did."

There was no real difference in result to the company between the device of setting up a fictitious salary and remitting most of it to Meyers in cashiers' checks, and the device of charging to a fictitious salary account company checks drawn for Meyers' personal benefit. The latter was simply another method of secretly channeling Aviation Electric's money to Meyers. The company's books and cancelled checks furnish corroboration of Lamarre's testimony that he had sworn falsely with respect to furnishing the apartment. Moreover, Miss Davis, the decorator, told the jury she dealt with Meyers only, although Lamarre told the subcommittee he informed her of his desire to present the appellant with the cost of the decoration. Miss Davis said Meyers told her "that he would give me checks on a little company that he owned or had an interest in—I don't remember just the words, but they satisfied me enough so that I was willing to take the check." She added that he gave her the name of the company as "the Aviation Electric Corporation of Dayton or Vandalia."

Appellant asserts Lamarre's characterization of the payment as a gift was made under the prodding of the subcommittee; a partially true but wholly immaterial assertion.[10] He originally and voluntarily described the transaction so that in law and in the fair meaning of language it amounted to a gift even though he disliked the word. Lamarre was reluctant to use the word "gift" only because he thought of a gift "as some item you give a man," and his position before the subcommittee was that the $10,000 was a payment of a moral obligation, a return due because of Meyers' favors to him. Moreover, as has been pointed out, Lamarre entered a plea of guilty with respect to this charge. As he had done with respect to the first two counts, Lamarre testified that he committed this perjury at Meyers' suggestion and solicitation.

From what has been said, we find the third count to have been established. La-

marre gave before the subcommittee the testimony charged as perjury; its falsity was proved by him and by corroborative evidence; and there was proof that Meyers suborned it.

In addition to his reasons for reversal which have been discussed and disposed of in the foregoing portion of this opinion, appellant argues his conviction should be set aside because the subcommittee before which Lamarre gave his perjured testimony was not lawfully constituted as such, and therefore was not "a competent tribunal" spoken of by the perjury statute. He discerns a variance between the indictment's allegation that the Senate committee "on April 19, 1947, created a subcommittee" and the proof from the committee chairman and counsel that a subcommittee was created in mid-April by the chairman, who announced to the full committee the names of the senators whom he had appointed as members of it. Appellant says the subcommitte was invalid because it was not created by a resolution of the full committee. The argument lacks substance because the evidence shows it is the unvarying practice of the Senate to follow the method of creating and appointing subcommittees which was employed in this instance. After consideration of all appellant's points with respect to the subcommittee sitting on October 4, we conclude that it was legally constituted.

The argument that a quorum was not present on October 4, 1947, because only one of the three senators then present had been among the five originally appointed in April, obviously confuses the creation of the subcommittee with the appointment of its personnel. On October 6, 1947, however, only two senators were present at the hearing. Since they were a minority of the subcommittee, they could not legally function except to adjourn. For that reason, the testimony of Lamarre given on that day cannot be considered as perjury nor can appellant be convicted of suborning it.

---

10 The prodding occurred on October 6, when appellant claims a quorum of the subcommittee was not present. Prior to that, however, and on October 4, Senator Ferguson asked Lamarre, "You say you made a gift of the decoration and some furniture of an apartment?", to which he replied, "Yes."

But practically all Lamarre's testimony was given on October 4, when a quorum was present. The proceedings of that day contain the perjurious statements described in all three counts, and his examination on October 6 was largely repetitious.

 A further ground for reversal is the court's alleged error in denying appellant's motion before trial to dismiss the indictment. It is asserted that the section of the District of Columbia Code, under which the indictment was laid, "has nothing whatever to do with any perjury or subornation of perjury committed in connection with an inquiry by a committee of the House of Representatives or Senate of the United States." In other words, appellant says only the federal perjury statute, 18 U.S.C.A. §§ 231, 232 [1948 Criminal Code, 18 U.S.C.A. §§ 1621, 1622], was applicable. To accept the argument would be to overrule our decisions in O'Brien v. United States, 1938, 69 App.D.C. 135, 99 F.2d 368, and Behrle v. United States, 1938, 69 App. D.C. 304, 100 F.2d 714, which we are not prepared to do.

Appellant's assignment of error concerning the court's conduct, his criticism of the court's charge to the jury, and his complaint concerning government counsel's argument to the jury, do not impress us as requiring discussion; but we deem it proper to refer, as briefly as possible, to the proposition advanced in the first division of the dissenting opinion which is filed herewith.

At the opening of the dissent it is said, "The testimony given by Lamarre before the Senate Committee was presented to the jury upon the trial in so unfair and prejudicial a fashion as to constitute reversible error."

The reference is to the fact the William P. Rogers, chief counsel to the senatorial committee, who had examined Lamarre befor the subcommittee and consequently had heard all the testimony given by him before that body, was permitted to testify as to what Lamarre had sworn to the subcommittee. Later in the trial the government introduced in evidence a stenographic transcript of Lamarre's testimony at the senatorial hearing.

In his brief here the appellant characterizes this as a "bizarre procedure" but does not assign as error the reception of Rogers' testimony. The dissenting opinion, however, asserts it was reversible error to allow Rogers to testify at all as to what Lamarre had said to the subcommittee, on the theory that the transcript itself was the best evidence of Lamarre's testimony before the subcommittee.

 That theory is, in our view, based upon a misconception of the best evidence rule. As applied generally in federal courts, the rule is limited to cases where the contents of a writing are to be proved.[11] Here there was no attempt to prove the contents of a writing; the issue was what Lamarre had said, not what the transcript contained. The transcript made from shorthand notes of his testimony was, to be sure, evidence of what he had said, but it was not the only admissible evidence concerning it. Rogers' testimony was equally competent, and was admissible whether given before or after the transcript was received in evidence. Statements alleged to be perjurious may be proved by any person who heard them, as well as by a reporter who recorded them in shorthand.

A somewhat similar situation was presented in Herzig v. Swift & Co., 146 F.2d 444, decided by the United States Court of Appeals for the Second Circuit in 1945. In that case the trial court had excluded oral testimony concerning the earnings of a partnership on the ground that the books of account were the best evidence. After pointing out the real nature and scope of the best evidence rule,[12] the court said, 146 F.-

---

[11] Keene v. Meade, 1830, 3 Pet. 1, 28 U.S. 1; Herzig v. Swift & Co., 2 Cir., 1945, 146 F.2d 444; In re Ko-Ed Tavern, 3 Cir., 1942, 129 F.2d 806, 142 A.L.R. 357; R. Hoe & Co. v. Com'r, 2 Cir., 1929, 30 F.2d 630; Boitano v. United States, 9 Cir., 1925, 7 F.2d 324.

[12] In doing so the court quoted with approval the following statement from Mc-

Kelvey, Evidence, 604, 5th Ed., 1944: "In its modern application, the best evidence rule amounts to little more than the requirement that the contents of a writing must be proved by the introduction of the writing itself, unless its absence be satisfactorily accounted for." See also 4 Wigmore, Evidence, §§ 1174, 1177–1182, 3d Ed., 1940.

2d at page 446: "* * * Here there was no attempt to prove the contents of a writing; the issue was the earnings of a partnership, which for convenience were recorded in books of account after the relevant facts occurred. Generally, this differentiation has been adopted by the courts. On the precise question of admitting oral testimony to prove matters that are contained in books of account, the courts have divided, some holding the oral testimony admissible, others excluding it. The federal courts have generally adopted the rationale limiting the 'best evidence rule' to cases where the contents of the writing are to be proved. We hold, therefore, that the district judge erred in excluding the oral testimony as to the earnings of the partnership."

A contention identical with that made in the dissenting opinion here was rejected by the United States Court of Appeals for the Second Circuit in 1912 in Brzezinski v. United States, 198 F. 65, 66. In that opinion the court said: "The first fact for the government to prove was the giving of the testimony charged in the indictment. It called the stenographer who took the notes of the proceedings before the grand jury. He testified that he took down the questions and answers that were put to Brzezinski on that day; that he made a transcription in typewriting from the notes, made this transcription himself, did not dictate it. * * * An assistant United States attorney who was present in the grand jury room also testified to the substance of what Brzezinski said on that occasion. It is contended that the court erred in admitting this testimony on the ground that it was 'not the best evidence.' This is a frivolous objection. Any one who has heard an oral statement made and remembers it may testify to what was said. * * *"

The Court of Appeals for the Third Circuit held, in Re Ko-Ed Tavern, 1942, 129 F.2d 806, 810, the best evidence rule does not have the application which the dissent here seeks to give it: "As to Light's half ownership of the bankrupt corporation, William Kochansky, president of the company, testified at the hearing before the referee that he and Light each owned fifty per cent of the capital stock of the corporation but that no stock certificates had ever been issued to either of them. The appellant objected to this testimony on the ground that the books of the bankrupt corporation were the best evidence of the matter under inquiry and that the parol evidence offered was inadmissible because the nonproduction of the books had not been satisfactorily explained. It is quite apparent that the appellant misconceives the scope of the 'best evidence' rule. That rule is applicable when the purpose of proffered evidence is to establish the terms of a writing. See 4 Wigmore on Evidence, 3rd Ed., § 1178. In this case there was no attempt to prove by parol either book entries or the terms of written instruments. * * *"

To the same effect is Boitano v. United States, 1925, 7 F.2d 324, 325, in which the Ninth Circuit said: "* * * it was equally competent to prove that testimony [of the plaintiff in error] by a witness who was present at the trial and heard the testimony given, regardless of whether the testimony was reported or whether it was not. 22 C.J. 344."

As we have pointed out, there was no issue as to the contents of the transcript, and the government was not attempting to prove what it contained; the issue was what Lamarre actually had said. Rogers was not asked what the transcript contained but what Lamarre's testimony had been.

After remarking, "* * * there is a line of cases which holds that a stenographic transcript is not the best evidence of what was said. There is also a legal cliche that the best evidence rule applies only to documentary evidence", the dissenting opinion asserts that the rule is outmoded and that "the courts ought to establish a new and correct rule." We regard the principle set forth in the cases which we have cited as being, not a legal cliche, but an established and sound doctrine which we are not prepared to renounce.

With the best evidence rule shown to be inapplicable, it is clearly seen that it was neither "preposterously unfair", as the appellant asserts, nor unfair at all, to permit the transcript of Lamarre's evidence to be introduced after Rogers had testified.

Since both methods of proving the perjury were permissible, the prosecution could present its proof in any order it chose.

There is no substance in the criticism, voiced by the appellant and in the dissent, of the fact that Rogers testified early in the unduly protracted trial and the transcript was introduced near its close. Appellant's counsel had a copy of the transcript from the second day of the trial, and had full opportunity to study it and to cross-examine Rogers in the light of that study. The mistaken notion that, had the transcript been first put in evidence, Rogers' testimony would have been incompetent is, of course, based on the erroneous idea that the best evidence rule had application.

It is quite clear that Meyers was in no way prejudiced by the order in which the evidence against him was introduced, nor does it appear that his position before the jury would have been more favorable had the transcript been offered on an earlier day of the trial.

The matters discussed in the second division of the dissenting opinion have been covered adequately, we think, in the earlier portion of this opinion.

Since we perceive no prejudicial error in appellant's trial, the judgment entered pursuant to the jury's verdict will not be disturbed.

Affirmed.

PRETTYMAN, Circuit Judge (dissenting).

I am of strong opinion that the judgment in this case should be reversed. I think so for two reasons.

I. The testimony given by Lamarre before the Senate Committee was presented to the jury upon the trial in so unfair and prejudicial a fashion as to constitute reversible error.

Lamarre testified before the Committee in executive session, only Senators, Mr. William P. Rogers, who was counsel to the Committee, the clerk, the reporter, and the witness being present. An official stenographic record was made of the proceedings. The testimony continued for two days, and the transcript is 315 typewritten pages. When Meyers was indicted, he moved for a copy of the transcript. The United States Attorney opposed, on the ground that the executive proceedings of a Senate Committee are confidential. The court denied Meyers' motion.

When the trial began, the principal witness called by the Government was Mr. Rogers. He was asked by the United States Attorney, "Now, will you tell the Court and the jury in substance what the testimony was that the defendant Lamarre gave before the Committee concerning the Cadillac automobile?" Two counts of the indictment related to this automobile.

The court at once called counsel to the bench and said to the prosecutor: "Of course, technically, you have the right to proceed the way you are doing. * * * I do not think that is hearsay under the hearsay rule, but it seems to me * * * that, after all, when you have a prosecution based on perjury, and you have a transcript of particular testimony on which the indictment is based, that you ought to lay a foundation for it or ought to put the transcript in evidence, instead of proving what the testimony was by someone who happens to be present, who has to depend on his memory as to what was said."

Counsel for the defense, objecting, insisted that the procedure was "preposterously unfair". The trial judge said that it seemed to him that the transcript ought to be made available to defense counsel. That was then done, but the prosecutor insisted upon proceeding as he had planned with the witness.

Mr. Rogers then testified: "I will try to give the substance of the testimony. * * * I am sure your Honor appreciates that I do not remember exactly the substance of the testimony. The substance of testimony was this, * * *." And then he gave "in substance" the testimony in respect to the Cadillac car. The same process was followed in respect to the matters covered by the other counts of the indictment, i. e., the redecoration of Meyers' apartment and Meyers' interest in the Aviation Electric Corporation. Defense counsel reserved part of his cross-examination until he could read the transcript.

The notable characteristics of this testimony of Rogers are important. In each instance, the "substance" was a short summation, about half a printed page in length. The witness did not purport to be absolute in his reproduction but merely recited his unrefreshed recollection, and his recollection on each of the three matters bears a striking resemblance to the succinct summations of the indictment. It is obvious that what the witness gave as "substance" was an essence of his own distillation and not an attempt to reproduce the whole of Lamarre's testimony. There are differences between Rogers' recollection and the transcript which are vital in the case.

The foregoing was on Wednesday, February 25th, the second day of the trial. On Tuesday, March 9th, which was two weeks later and the eleventh day of the trial, the Government, as it was about to close its case, offered the whole transcript of Lamarre's testimony in evidence as an exhibit, and it was received without objection. The prosecutor and one of his assistants then read to the jury such portions of the transcript as they deemed material. Defense counsel then read the portions which they deemed material.

Upon the reserved cross-examination of Rogers, the following occurred:

"Q. Is it not a fact that nowhere in his testimony did the defendant Lamarre on October 4th or 6th, 1947, testify that Bennett E. Meyers was not financially interested in or connected with the Aviation Electric Corporation? A. I don't think he ever used those words.

"Q. Is it not a fact that all of his testimony, taken as a whole, negatives such an interpretation?

"Mr. Fay: I think that is purely a question of law.

"The Court: Objection sustained, I do not think that is proper cross-examination."

Defense counsel inquired of Rogers if it were not a fact that "the substance of Lamarre's testimony with reference to the Cadillac car" was so-and-so. The court interrupted and said that counsel was asking the witness "to construe" Lamarre's testimony and that since the jury had heard the testimony read it would have to determine what its meaning was. Counsel for the defense agreed with that proposition and moved to strike all of Rogers' direct testimony as to what Lamarre's testimony had been. The court denied the motion, saying that Rogers had not, on direct, been "interpreting" Lamarre but had stated "the substance", which the court said "is an entirely different thing". Rogers then answered as to his "recollection", commenting, "I stated at the outset it is just my recollection." He repeated that comment in effect several times. Finally counsel asked a specific question as to Lamarre's use of the word "gift" (which we note was the key word in Count Five), and the prosecutor objected on the ground that "the record [i. e., the transcript] speaks for itself". The court sustained the objection. A similar question was then asked, objected to, and the objection sustained. Thereupon counsel dropped that line of examination.

To my mind, the foregoing procedure was, as defense counsel characterized it, "preposterously unfair". It lacked the minimum elements of fair play essential to our concept of a fair trial. I reach my conclusion upon both practical and theoretical considerations. The problem has both aspects.

The practical elements are these: The transcript showed exactly what Lamarre told the Committee, word for word. But the words and expressions charged to him by the indictment do not appear in the transcript. Whether he testified as alleged, whether he said what is alleged to be the truth, or whether he said what is alleged to be false, were matters of inference, or conclusion, or summation, or "substance", to be gathered from his answers to many questions. Mr. Rogers was the counsel who interrogated Lamarre before the Committee. The Committee was the actual complainant in the perjury charge. Rogers was its representative.

Thus, the sum of the practical aspect of the matter is that the prosecutor put to the jury at the opening of his case, out of the mouth of the complainant, under oath and on the stand, the complainant's interpretation of the alleged perjured testimony, translating it into approximately what the indictment attributed to the alleged per-

jurer. I need not elaborate the tremendous advantage thus gained by the Government, an advantage later magnified by what occurred on attempted cross-examination.

The difference between the presentation of elemental facts and the piecing of them together so as to reach a conclusion is basic.[1] One is evidence and the other argument. The principle runs through much of the law of evidence.

I doubt that anyone would say that the prosecutor could first have put into evidence the transcript of Lamarre's testimony and thereafter have produced Rogers to give to the jury from the witness box his own summation of it. He would have been met with a ruling that "the transcript speaks for itself". Indeed, exactly that developed. The prosecutor first produced the oral summation, and it was admitted. Then he produced the transcript. Then, when defense counsel attempted to cross-examine as to "the substance", he was blocked because of the presence of the transcript. Can a prosecutor do by so simple and obvious a maneuver that which the law otherwise forbids as unfair? Can he thus transform into sworn evidence from the box that which is otherwise only argument from the rail? I do not think so. In the presence of the unimpeached transcript, even though it was temporarily on counsel table and not yet in the clerk's hands, summation and interpretation was argument and not evidence.

Nor was the prejudice cured by the availability of the transcript to defense counsel for cross-examination. If that were so in this case, the same doctrine would admit in evidence any opinion, or description, or summation of elemental facts otherwise provable in precise accuracy. The impression given by a succinct summation by a live witness on the stand cannot be corrected or offset by the later reading of a long, cold record. It is my view that for this exceedingly practical reason the reception of Rogers' summation in evidence was not permissible.

From the theoretical viewpoint, I realize that there is a line of authority that (absent or incompetent the original witness) a bystander who hears testimony or other conversation may testify as to what was said, even though there be a stenographic report.[2] And there is a line of cases which holds that a stenographic transcript is not the best evidence of what was said.[3] There is also a legal cliche that the best evidence rule applies only to documentary evidence.[4] The trial judge in this case was confronted with that authority, and a trial court is probably not the place to inaugurate a new line of authority. But I do not know why an appellate court should perpetuate a rule clearly outmoded by scientific development. I know that courts are reluctant to do so.[5] I recognize the view that such matters should be left to Congress. But rules of evidence were originally judge-made and are an essential part of the judicial function. I know of no reason why the judicial branch of Government should abdicate to the legislative branch so important a part of its responsibility.

I am of opinion, and quite ready to hold, that the rules of evidence reflected by the cases to which I have just referred are outmoded and at variance with known fact, and that the courts ought to establish a new and correct rule. The rationale of the so-called "best evidence rule" requires that a party having available evidence which is relatively certain may not submit evidence which is far less certain. The law is concerned with the true fact, and with that alone; its procedures are directed to that

---

[1] I use some of the words of Section 1 of Chapter I of Wigmore on Evidence, and refer to that authority for a discussion of the subject.

[2] Johnson v. Umsted, 8 Cir., 1933, 64 F.2d 316; Weinhandler v. Eastern Brewing Co., 1905, 46 Misc. 584, 92 N.Y.S. 792; State v. Ortego, 1945, 22 Wash.2d 552, 157 P.2d 320, 159 A.L.R. 1232.

[3] Cooper v. Hoeglund, 1946, 221 Minn. 446, 22 N.W.2d 450; McColgan v. Noble, Mo.App., St. Louis, 1930, 29 S.W.2d 205; Brice v. Miller, 1892, 35 S.C. 537, 15 S.E.

272; Pressley v. State, 1921, 18 Ala.App. 40, 88 So. 291. See cases collected at 15 A.L.R. 544 (1921); 122 A.L.R. 436 (1939); 159 A.L.R. 1250 (1945).

[4] Wuerth v. Frohlich, 1930, 251 Mich. 701, 232 N.W. 373; Carroll v. Gimbel Bros., 1st Dept. 1921, 195 App.Div. 444, 186 N.Y.S. 737; Pecoraro v. Pecoraro, 1932, 105 Pa.Super. 543, 161 A. 591.

[5] Read United States v. Provident Trust Co., 1934, 291 U.S. 272, 54 S.Ct. 389, 78 L.Ed. 793.

objective, and to that alone. It should permit no procedure the sole use of which is to obscure and confuse that which is otherwise plain and certain.

We need not venture into full discussion of all the principles involved.[6] As between two observers of an event, the law will not accept the evidence of one and exclude that of the other, because the law cannot say which is more accurate. But as between a document itself and a description of it, the law accepts the former and excludes the latter, because the former is certain and the latter is subject to many frailties. So as between the recollection of the parties to a contract evidenced by a writing and the writing itself, the law rejects the former and accepts the latter. To be sure, the writing may be attacked for forgery, alteration or some such circumstance. But absent such impeachment, the writing is immutable evidence from the date of the event, whereas human recollection is subject to many infirmities and human recitation is subject to the vices of prejudice and interest. Presented with that choice, the law accepts the certain and rejects the uncertain. The repeated statement in cases and elsewhere that the best evidence rule applies only to documents is a description of practice and not a pronouncement of principle. The principle is that as between human recollections the law makes no conclusive choice; it makes a conclusive choice only as between evidence which is certain and that which is uncertain.

It may be remarked at this point that the transcript in the case at bar is a document, not challenged for inaccuracy or alteration. It possesses every characteristic which the most literal devotee of established rules of evidence could ascribe to written evidence of a contract as justification for preference of such writing over the recollection of the parties.

In my view, the court iterates an error when it says that the best evidence rule is limited to cases where the contents of a writing are to be proved. The purpose of offering in evidence a "written contract" is not to prove the contents of the writing. The writing is not the contract; it is merely evidence of the contract. The contract itself is the agreement between the parties. Statutes such as the statute of frauds do not provide that a contract be in writing; they provide that the contract be evidenced by a writing, or that a written memorandum of it be made. The writing is offered as evidence of an agreement, not for the purpose of proving its own contents. A deed to real estate is different, being actually the instrument of conveyance, although there is authority that it too is merely evidence of the agreement between the parties.

The doctrine that stenographic notes are not the best evidence of testimony was established when stenography was not an accurate science. The basis for the decisions is succinctly stated in the 1892 case quoted as leading by Professor Wigmore: "Stenographers are no more infallible than any other human beings, and while as a rule they may be accurate, intelligent, and honest, they are not always so; and therefore it will not do to lay down as a rule that the stenographer's notes when translated by him are the best evidence of what a witness has said, in such a sense as to exclude the testimony of an intelligent bystander who has heard and paid particular attention to the testimony of the witness."[7]

But we have before us no such situation. Stenographic reporting has become highly developed, and official stenographic reports are relied upon in many of the most important affairs of life. Even as early as 1909, a court referred to "Experience having demonstrated the impartiality and almost absolute accuracy of the notes of court stenographers" as the reason for legislation making admissible as evidence a court stenographer's report.[8] In the present instance, at least, no one has disputed the correctness of the transcript.

From the theoretical point of view, the case poses this question: Given both (1) an accurate stenographic transcription of a

---

[6] See 4 Wigmore, Evidence, § 1173 et seq. (3d ed. 1940), and the many cases there cited.

[7] 4 Wigmore, Evidence, § 1330 (3d Ed. 1940), quoting McIver, C. J.; in Brice v.

Miller, 1892, 35 S.C. 537, 549, 15 S.E. 272.

[8] Wilmoth v. Wheaton, 81 Kan. 29, 105 P. 39.

witness' testimony during a two-day hearing and (2) the recollection of one of the complainants as to the substance of that testimony, is the latter admissible as evidence in a trial of the witness for perjury? I think not. To say that it is, is to apply a meaningless formula and ignore crystal-clear actualities. The transcript is, as a matter of simple, indisputable fact, the best evidence. The principle and not the rote of the law ought to be applied.

I do not suggest that a stenographer's report is unimpeachable; that question is not here.

I find some support for my view in the authorities. As early as 1878 the Supreme Court, in ruling upon the problem, seemed to qualify the traditional view. It said that *"Where a stenographer has not been employed,* it can rarely happen that anyone can testify to more than the substance of what was testified * * *."* (Italics supplied.)[9] And Volume 2, Section 693, of Wharton's Criminal Evidence, after discussing the cases, has this to say: "However, since it is a primary rule of evidence that the best evidence must be produced, it would seem that since practically all testimony is now taken by stenographers, a transcript of the stenographer's notes would be the best evidence, and that oral evidence would not be admissible when such transcript could be obtained." And there is authority to the effect that even where a witness is permitted to give the substance of prior testimony of another, he must reproduce as accurately as he can the whole of that testimony and cannot give merely his own summation.[10]

II. The proof did not establish that Lamarre told the Senate Committee what the indictment, in the first count, says he did, and it established that he told the Committee what the third and fifth counts say is the truth. What Lamarre told the Committee was, of course, the first factual question in the prosecution, and thus in the defense, of Meyers.

The indictment charged that Lamarre made three specific false statements to the Senate Committee.

I take it as elementary that an indictment must allege the commission of an act and not mere rascality; that the offensive act must be alleged with precision, clarity and certainty; that upon the trial the Government must prove the commission of the act alleged, and that no other misdeed, however proved, will support conviction; and that an accused need defend against no proof except that of the act alleged. The issue now before us cannot be resolved correctly, or indeed even understood, unless we first note with attentive care exactly what this indictment says Lamarre told the Senate Committee.

The first count of the indictment charged that Lamarre testified falsely that "Meyers *was not financially interested in or connect*-ed with the Aviation Electric Corporation of Dayton and Vandalia, Ohio, during those years [i. e., 1940, 1941, 1942, 1943, 1944, 1945, 1946 or 1947] or any of them".

That is a very specific, precise charge. Also it is quite clear and easily understood. It relates to financial interest or connection of any sort on the part of Meyers in or with the corporation. It relates to any one of the years 1940–47. Conviction required the Government to prove the allegation as made. Conversely, Meyers was called upon to defend against the allegation made, and none other.

First, we note that Lamarre never made the direct assertion in the language the indictment recites. No one claims that he did. As we have already noted, Mr. Rogers testified, "I don't think he ever used those words." And when asked, in reference to finances, "So that Lamarre did not say, in summary, as you understood it, that Meyers had no connection with the company?" Mr. Rogers replied, "I never said he said that."

Second, we note that Lamarre repeatedly testified to the precise contrary of what the indictment charged he said. Financial interest in or connection with a corporation is of two principal sorts, owner and creditor. Lamarre testified that Meyers had both. He told the Committee that Meyers put up all the money for the stock upon the incorporation. He identified the original book

---

[9] Ruch v. Rock Island, 97 U.S. 693, 24 L.Ed. 1101.

[10] See discussion and cases at 15 A.L.R. 548 et seq. (1921) and at 79 A.L.R. 1410 et seq. (1932).

entry which showed Meyers as the sole original stockholder. He said that the named incorporators were "dummies". He said that when the stock was transferred on the records to him (Lamarre), he endorsed it in blank and left it at the company office where Meyers had access to it. He also testified that Meyers put up any money which the corporation needed and that Meyers was the sole creditor of the corporation. He even testified flatly, as follows:

Q. "That [the stock transfer to Lamarre] was just a bookkeeping transaction, and you held the stock and then you endorsed them over to Meyers and he took the certificates, is that correct? ·

"Mr. Lamarre: Yes.

"[Q.] So you understood all of the time that for all practical purposes he owned the business, did you not?

"Mr. Lamarre: That is right.

"[Q.] He put all of the money in and he owned all of the stock?

"Mr. Lamarre: That is right."

And again the record shows:

Q. "In other words, without any payment on your part, and he [Meyers] made the arrangement that you were to endorse them in blank and he would take possession of them, is that correct?

"Mr. Lamarre: Yes."

And again Lamarre testified: "Of course, as I said, the company actually had no money; it was borrowed from General Meyers."

He testified that at the end of 1941 the corporation owed Meyers $30,000, and he identified a list which showed that Meyers advanced $58,310 to the corporation, of which amount $20,000 was advanced in 1942.

The very first questions by defense counsel upon the cross-examination of the witness Rogers at the trial developed the nub of the matter:

"Q. Mr. Rogers, did I understand you to say that Lamarre testified that he or General Meyers, for all practical purposes, owned the stock, owned the company: Aviation Electric? A. Well, he said both ways. He said he was the owner of the stock—

"Q. Yes? A.—but he said, when we pressed him with questions, in view of the fact that Meyers had put up all the money and had given the stock in the company, for all practical · purposes Meyers was the owner.

"Q. So that actually, as the testimony' was left, he didn't deny that Meyers was, in that sense at least, interested in the company? A. No.

"Q. And in that sense at least financially interested in the company? A. That is right.

"Q. And he did not deny or state falsely in that sense that Meyers was connected with the company? A. No."

It is impractical to quote in this opinion the whole of the testimony upon the point. But to my mind the record of what Lamarre told the Senate Committee conclusively shows that he made perfectly clear to the Committee, by repeated and unequivocal statements, that Meyers was the originator and first sole stockholder of the corporation; that when the stock was transferred on the record to him (Lamarre), he was merely a record holder, having paid nothing for the stock and having endorsed the certificate in blank and left it physically available to Meyers; that Meyers was the sole financial backer of the company, and that during the years 1940–42 Meyers was a creditor of the corporation in large amounts, his loans evidenced by notes and · secured by pledge of all the stock. Throughout his testimony there was no intimation that the corporation had any financial support of any sort except that of Meyers. Lamarre made many statements and representations which the record may indicate were false and which he later repudiated. But he did not, as best I can read the record, even suggest that Meyers had no financial interest in or connection with the corporation in any of the years 1940–47. And that is what the indictment says he told the Committee, and that is what the Government had to prove in order to sustain conviction.

I do not agree with the court that appellant's contention in this connection is based upon one question and answer. As I understand it, the contention is based upon the

whole of Lamarre's testimony before the Committee, upon many questions and answers. Certainly my conclusion is.

Neither do I agree with the court's view that if Meyers' interest in the corporation during any of the years named be established, the conviction must be sustained. Lamarre is alleged by the indictment to have told the Committee that Meyers had no interest in the corporation during the years 1940, 1941, 1942, 1943, 1944, 1945, 1946, 1947, or any of them. The Government had to prove that Lamarre made that statement. If Lamarre told the Committee that Meyers had an interest during three of the eight years named, he did not say what the indictment says he said. Upon such proof, conviction under the indictment as drawn could not stand. We cannot rewrite the indictment so as to allege that Lamarre said something else. It is perfectly true that *if* Lamarre made the statement ascribed to him by the indictment, and if it were proved that Meyers had an interest in any one of those years, Lamarre's perjury would be established. Therein lies the confusion. It seems to me that the court is thinking about the proof necessary to establish the falsity of the statement recited in the indictment, whereas the question under consideration at this point is the proof necessary to establish that Lamarre *made* the alleged statement. This particular question is not "Was the alleged statement false?" The question is "Did Lamarre make the alleged statement?" It seems plain to me that if, as the court finds, Lamarre asserted and never denied Meyers' interest in some of the years 1940–47, he did not state that Meyers had no interest in *any* of those years. The Government has simply failed to prove one of the essentials of its case under the indictment as drawn.

In the third place, in respect to this count, everybody agrees that Lamarre made it clear to the Committee that Meyers was a creditor of the corporation in large amounts during the years 1940, 1941 and 1942; that, in fact, he supplied all the money the corporation needed when it was in need. Upon the trial below, the insistence of the witness Rogers was that Lamarre told the Committee that Meyers was not financially interested "except as a creditor". The same excep-

tion runs through every claim in the Government's brief before us. The opinion of the court recites that "Meyers advanced considerable sums for working capital and took therefor the company's promissory notes which were secured by the pledge and delivery to him of the certificates evidencing all its capital stock" and that "by the end of 1942 all Meyers' loans had been repaid." The court finds and recites that Lamarre insisted that the stock "did not belong to Meyers all the time but actually became his [Lamarre's] when the notes were paid." The notes were paid at the end of 1942. So the court's view of Lamarre's testimony is that Meyers owned the stock in 1940, 1941 and 1942. The court says that Lamarre tried to persuade the Committee that Meyers bore to the corporation "merely the relation of creditor"; and the court concludes from the evidence as a whole that Meyers had no interest "except that he was a creditor and held the capital stock as collateral".

The unspoken major premise to the Government's contention and the court's position is that a creditor upon a promissory note of a corporation and pledgee of all its capital stock has no financial interest in or connection with the corporation. I cannot agree with that proposition. Of course, the term "interest in" has many meanings, some of them narrow and technical. But we are not construing a statute, and, moreover, the whole expression before us is "interested in or connected with". We are examining an allegation in an indictment which purports to recite what a witness said on the stand in a congressional hearing. The indictment recites that his testimony was that a certain person had no financial interest in or connection with a corporation. The witness actually said that the person was a substantial and secured creditor of the corporation. The witness may have been guilty of perjury, but he clearly was not guilty of the perjury charged by the indictment.

The second charge against Meyers (Count Three of the indictment) related to a Cadillac automobile. The charge was premised upon allegations in the indictment that "The fact was, as Bleriot H. Lamarre then knew, that that automobile had been

purchased for the personal use of Bennett E. Meyers. Bleriot H. Lamarre nevertheless wilfully and contrary to his said oath testified falsely * * * that that Cadillac automobile had been purchased for the Aviation Electric Corporation and for the use of the Aviation Electric Corporation."

Thus, the indictment recites, first, what the truth was and, second, what Lamarre told the Committee. Again we must note with care exactly what the indictment charged. The critical question posed by its allegations was: For whose use was the car purchased? According to the indictment, it was perjury to say that the purchase was "for the use" of the corporation because in truth it was "for the personal use" of Meyers.

The testimony of Lamarre relating to the automobile is comparatively short. It came near the end of the second day of his testimony. He made no direct statement to the Committee as to whose use the car was purchased for. His meaning in that respect is a matter of inference. What he said was that the company had one car, a Cadillac, purchased from the Capitol Cadillac Company in Washington, where Meyers lived (the corporation was in Dayton and Vandalia, Ohio); that Meyers picked out the car, bought it and took delivery on it; that Meyers had access to it; that Meyers had the keys to it; that the car remained in Washington; that Meyers kept it in his garage; that the car was bought and titled in the company name; that he (Lamarre) was the only officer in the company who had access to the car; that Meyers made arrangements to get the insurance; that the car was insured in Washington; that the car cost $3,000 and was sold to Meyers' father-in-law for $1,400; that it was sold because "We had no further use for it"; that they "had not had too much use for it." None of these elemental facts has been disputed; as to them Lamarre testified truthfully before the Committee.

The contention of the Government and the holding of the court is that this factual testimony is so positive to the effect that the car was purchased "for the use of the Aviation Electric Corporation" as to make it perjury, since the fact was that the purchase was "for the personal use" of Meyers.

I have some difficulty in drawing a clear line between purchases of cars for the use of a corporation and purchases of cars by a corporation for the personal use of an officer, or sole stockholder, or sole creditor. Frequently, it seems to me, the use of the officer, stockholder or creditor is, in many senses, a use of the corporation. At any rate, it is frequently so considered in business circles. Be that as it may, I cannot find in Lamarre's testimony a distinction between company use and Meyers' personal use so clear and sharp as to constitute one a perjury when the other is the fact. Lamarre certainly told the Committee that Meyers selected the car, arranged for its purchase, bought it in Washington, kept it in his garage in Washington (the company being located in Ohio), had the keys, and arranged for the insurance. To my mind, it is a logical and fairly obvious conclusion from that testimony that the car was purchased for Meyers' use. It seems to me that what the indictment recites as the truth is as fair an inference as any other from Lamarre's actual testimony.

The Government and the court put much stress upon Lamarre's reference to the car as the "Company car" and to his having driven it once from Ohio to Washington. But those scraps of testimony are not, to my mind, an affirmation that the car was purchased for the use of the company and not of Meyers.

I can find in Lamarre's testimony no clear inference that the car was purchased for the use of the corporation in critical contradistinction to a purchase for the use of Meyers. Unless his testimony was clear in that difference, conviction upon this indictment, as drawn, cannot be sustained. One is perjury, the other truth, the indictment says. Unless he said one and not the other, prosecution for this perjury fails.

The problem posed by this phase of the case is not that presented when a witness swears both truthfully and falsely in the same testimony. That witness may be guilty of perjury in that part of his testimony which is false, even though on other matters he testifies truthfully, and even though he recants that which is false. In the case at bar, Lamarre testified to a number of simple facts about the car, all of

which facts are admittedly true. The question is: Did he thereby convey a false impression? If what he actually said fits what the indictment says was the truth of the transaction, he is not guilty of perjury. In other words, in my view, if either of two impressions, one true and the other false, can be gathered from a true recitation of elemental facts, conviction for perjury fails.

The third count of the indictment charged that Lamarre, knowing that "the cost of redecorating the apartment of Bennett E. Meyers * * * had been paid for out of the funds of the Aviation Electric Corporation", testified falsely before the Senate Committee that the cost of the redecoration "was a gift from himself, Bleriot H. Lamarre."

Again we must note with care what the indictment says. It makes the difference between "paid for out of the funds of" the corporation and "a gift from himself" the difference between truth and perjury. I have some doubt as to the validity of the count because of its vagueness; the payment might be correctly described by both the expressions used. But my dissent does not arise from that view.

Lamarre clearly, emphatically and in complete detail testified before the Committee that the cost of redecorating Meyers' apartment was paid for out of the funds of the corporation. No one disputes that literal fact. He said that the bills were paid by corporation checks, drawn on corporation bank accounts, and first charged as sales expenses on the corporate books. He identified the corporate checks. In all these respects he testified to what was the literal, actual truth, and no one has since alleged otherwise. So far there is, and can be, no dispute but that he testified to what the indictment says was the truth.

The difficulty arises because it is alleged that Lamarre falsely characterized the transaction as a gift from himself to Meyers.

Lamarre told the Committee that the cost of redecorating Meyers' apartment ($10,-000), having first been charged on the corporate books as a business expense, was later removed from that account and entered as a charge against his own salary account.

His statements in these respects were true; that was exactly what was done. The real issue of truth or falsity revolves about the salary account itself. The Government says that the account was spurious, that Meyers was the owner of the corporation, that Lamarre never had any such salary, and that the account was merely a device for siphoning profits to Meyers. But the indictment does not raise that issue. We cannot rewrite the indictment to charge that whereas the truth was that Meyers owned the corporation and all its profits, including what was charged as Lamarre's salary, Lamarre falsely represented that the salary credited to him was his own and that charges against it were gifts by him.

Much is made of the word "gift". The facts as shown by the record are quite simple. When Lamarre appeared before the Committee, he was interrogated at length throughout the morning concerning his and the corporation's relationship with Meyers, during the course of which much discussion was had of "gifts" from Lamarre to Meyers and from Meyers to Lamarre. The decorating of the apartment was not mentioned. After the luncheon recess, Lamarre said: "There is one thing I would like to say before we proceed. That is, you laid a great deal of stress this morning on what you called gifts to General Meyers. I would like to amplify my statements on that, because at the time I did not consider it a gift, but it was after General Meyers had come to Washington, he had an apartment decorated, and I paid for the decoration of that apartment, and the furnishings." Throughout that afternoon and the next morning, Lamarre was questioned at great length and in great detail concerning this transaction. He identified the checks and explained at great length the book entries, and repeatedly reasserted his claim that he caused this payment because of what Meyers had done for him. Until almost the close of this interrogation, the expression "gift" was not used. Then the following occurred:

"Mr. Rogers: What do you consider this $10,000 now, and I am not talking about Saturday morning or Saturday afternoon; I am speaking now about now; what do you consider this $10,000 was?

"Mr. Lamarre: As I said, it was pretty much, I considered it a moral obligation on my part to do something for General Meyers because of the things he had done for me.

"Mr. Rogers: Look, you are a college graduate and president of the corporation. You understand what I mean. Was this $10,000 a repayment for a loan to General Meyers?

"Mr. Lamarre: No, it was not.

"Mr. Rogers: Was it part of any business deal at all?

"Mr. Lamarre: No.

"Mr. Rogers: And it had no consideration.

"Mr. Lamarre: No.

"Mr. Rogers: No legal consideration, so it must have been a gift, is that right?

"Mr. Lamarre: It could have been considered a gift.

"Mr. Rogers: I do not know what it could be; what was it?

"Mr. Lamarre: I told you how I felt about it.

"Senator Cain: Let me ask one question. What could it possibly be considered if it was not an outright gift for you said you wanted to do something for General Meyers.

"Mr. Lamarre: That is right. In a legal sense, it undoubtedly would be a gift.

"Senator Cain: In what other sense would it be anything other than a gift or a present or a gratuity to a friend?

"Mr. Lamarre: In my own personal feelings about it, it was that it was, I was sort of obliged to do that for him, or I wanted to do it for him because of the things that he had done for me.

"Senator Cain: But the transaction in itself has absolutely nothing to do with your corporation business?

"Mr. Lamarre: That is correct.

"Senator Cain: It happens to have been paid from the corporation?

"Mr. Lamarre: That is correct.

"Senator Cain: But that was never your thought or intention; it was your personal obligation by personal wish to a personal friend?

"Mr. Lamarre: That is correct."

Upon this record Lamarre's use of the expression "gift" plays little part in the question of perjury. Lamarre did not urge that expression upon the Committee. He testified to the constituent factual elements of the transaction. "Gift" was merely an inference, or characterization, which his interlocutors attempted, with limited success, to put into his mouth.

It is my view that upon examination of the official stenographic transcript of what Lamarre said to the Senate Committee, the trial court should have directed a verdict of acquittal upon this indictment. The basic issue presented by the defense was whether Lamarre said what the indictment alleged that he said. The issue was not what Lamarre said generally or in other respects. In each of the three instances, the stenographic transcript showed that he told the Committee what the indictment alleged to be the true fact; not only by a separate chance phrase but by the whole purport of his testimony. That he perjured himself in other respects is irrelevant in this prosecution.

I dissent from the decision of the court, because it seems to me to be a departure from the basic principle that conviction can be had only upon proof of the acts alleged in the indictment.