**UNITED STATES v. LATTIMORE.**
**No. 11849.**

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 25, 1954.

Decided July 8, 1954.

Stephens, Chief Judge, and Bazelon, Clark, Danaher, Edgerton, and Wilbur K. Miller, Circuit Judges, dissented in part.

Mr. Leo A. Rover, U. S. Atty., Washington, D. C., with whom Mr. John W. Jackson, Sp. Asst. to the Atty. Gen., Dept. of Justice, and Messrs. George J. Donegan, Edward F. Hummer, and John H. Davitt, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellant. Mr. Lewis A. Carroll, Asst. U. S. Atty., and Mr. William J. Peck, Asst.

U. S. Atty. at the time the brief was filed, Washington, D. C., entered appearances for appellant.

Messrs. Joseph C. O'Mahoney and Thurman Arnold, Washington, D. C., with whom Messrs. Abe Fortas and Paul A. Porter, Washington, D. C., were on the brief, for appellee.

Before STEPHENS, Chief Judge, and EDGERTON, CLARK, WILBUR K. MILLER, PRETTYMAN, BAZELON, FAHY, WASHINGTON and DANAHER, Circuit Judges.

PRETTYMAN, Circuit Judge.

The appellee, Lattimore, was indicted under the District of Columbia statute [1] in seven counts for perjury allegedly committed while he was testifying before a Subcommittee of the Senate Judiciary Committee. Upon a motion to dismiss, the District Court dismissed Counts I, III, IV and VII. The United States appealed from that order.

We note at the beginning of our consideration that we have before us merely the validity of the indictment. Nothing said in this opinion relates to any situation which may develop upon trial. Thus, for example, it sometimes happens that a question which appears to be material out of context may fade into immateriality when its full setting is depicted. And the same is true in respect to truth or falsity, intent, etc. No pleading has been filed by the defendant except the motion to dismiss, and no evidence has been taken. The question before us is merely whether the indictment is sufficient to put the accused to his response.

Count I, after introductory allegations, charged that Lattimore testified falsely when he said "that he had never been a sympathizer or any other kind of promoter of Communism or Communist interests"; that this testimony was untrue, "in that said defendant had been a sym-

pathizer and promoter of Communism and Communist interests."

The Constitution [2] requires that in all criminal prosecutions an accused shall be informed of the nature and cause of the accusation against him. The crime of perjury under the District of Columbia Code, upon which this indictment is premised, is committed when a person under oath "wilfully and contrary to such oath or affirmation states or subscribes any material matter which he does not believe to be true". Not only is it a basic rule that "Criminal statutes must have an ascertainable standard of guilt or they fall for vagueness",[3] but it is equally well established [4] that an indictment must charge an offense with such reasonable certainty that the accused can make his defense. The cases on the point are myriad, as reference to any authority quickly reveals.

We are of opinion that this First Count of the indictment is void for vagueness. The word "sympathizer" is not of sufficiently certain meaning to sustain a charge of perjury. This count is that Lattimore said he had never been a sympathizer whereas he had been a sympathizer. There is no definition of the term "sympathizer" or any concrete specification of its content either in the indictment or in the statute. Without such definition or specification the term has no certain meaning. According to the Oxford Dictionary, for example, the word "sympathize" means "To suffer with" as well as "to agree in nature, disposition, qualities, or fortunes"; and it also means "to feel compassion" or "to condole" as well as "to approve or incline to approve".

The Government says that since "promoter" is a term of certainty the count is valid, even though "sympathizer" is invalidly vague. But that position is not tenable. Even if "promoter" were

---

1. 31 Stat. 1329 (1901), D.C.Code § 22-2501 (1951).

2. Amend. VI.

3. Williams v. United States, 341 U.S. 97, 100, 71 S.Ct. 576, 95 L.Ed. 774 (1951).

See also Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948).

4. United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588 (1876).

a perfectly certain term (which we do not decide), the presence of the uncertain word is sufficient to destroy the count. The count says that Lattimore denied that he was a sympathizer *or* promoter whereas in truth he was a sympathizer *and* promoter. Thus Lattimore, under the indictment as drawn, would have to be prepared to defend himself against both charges. He must be so prepared, because if the Government upon trial should prove him to be either of the two terms a conviction on the count would stand. The accused is entitled under the Constitution to be advised as to every element in respect to which it is necessary for him to prepare a defense.

In oral argument Government counsel urged that the indictment defines "sympathizer" as a kind of promoter when it charges that Lattimore denied being "a sympathizer or any other kind of promoter". Thus, the Government contended, if the word "promoter" is certain, the word "sympathizer" is also necessarily certain. But this contention is without value in our consideration, because the expression just quoted—"any other kind of promoter"—may also mean that "promoter" is used in the indictment to describe a kind of "sympathizer", whatever that term may mean.

 We think the vagueness of this count cannot be cured by a bill of particulars. Details in support of a valid count can be supplied by a bill of particulars, but a count which is too vague to be valid cannot be made valid by such a bill. The prosecutor, in supplying the particulars, cannot guess at what was in the grand jury's mind or ascribe a meaning to a charge by the grand jury if that meaning is not apparent upon the face of the indictment.

Chief Judge Stephens does not agree with this opinion upon this count and has filed a separate statement of his views upon it.

The order of the District Court on Count I is affirmed.

The Third Count charged in pertinent part that Lattimore testified falsely as follows:

"Mr. Morris. And it is your testimony that you did not know he [Asiaticus] was a Communist?

"Mr. Lattimore. I didn't know he was a Communist. I would have said, speaking of the late 1930's that I would have thought he was possibly a Socialist, but not a Communist."

and that this testimony was untrue "in that said defendant in the late 1930's knew that 'Asiaticus' was a Communist."

██ The key word in this charge is "know". We think the word is sufficiently definite to support the count against a charge of invalid vagueness. Criminal charges involving knowledge, and proof of knowledge pro and con, are frequent occurrences in the courts. The Supreme Court said in American Communications Ass'n v. Douds: [5]

"But courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred."

This count is also attacked upon other grounds. They are based upon the Resolution and the investigation. The Institute of Pacific Relations was founded in 1925. It is described as a loose federation of some ten or twelve national institutes devoted to the study of the problems of the Pacific—economic, social, political, etc. It published a quarterly magazine known as "Pacific Affairs". Appellee Lattimore was editor of this magazine from 1934 to 1941.

In 1950 the Senate adopted a Resolution.[6] After the Whereas clauses the Resolution read as follows:

"*Resolved*, That the Committee on the Judiciary, or any duly author-

---

5. 339 U.S. 382, 411, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

6. Sen.Res.No.366, 81st Cong., 2d Sess.

ized subcommittee thereof, is authorized and directed to make a complete and continuing study and investigation of (1) the administration, operation, and enforcement of the Internal Security Act of 1950; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and the protection of the internal security of the United States; and (3) the extent, nature, and effects of subversive activities in the United States, its Territories and possessions, including, but not limited to, espionage, sabotage, and infiltration by persons who are or may be under the domination of the foreign government or organizations controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force and violence."

■ The first question involved in these other attacks upon the indictment is: Was the Resolution valid under the First Amendment? We held in Barsky v. United States [7] that sufficient information had been submitted to the Congress by responsible authorities, to the effect that Communism and the Communists represent an actual threat to the security of this country, to justify inquiry into the subject by the Congress. Other events since then, descriptions of which are embodied in judicial decisions, executive pronouncements, and legislative enactments, have further established that the antagonism between organized Communism and the Government of this country is not merely a conflict of ideologies but includes potential violence. Expressions to the effect that Barsky was an approval by this court of congressional restriction upon the mere expression of political opinion spring from misconceptions.[8] We adhere to the view expressed in that case and hold that Congress had power to study and investigate the administration, etc., of the Internal Security Act of 1950, other laws relating to espionage, sabotage, and the protection of the internal security of the United States, and the extent and nature of subversive activities, including infiltration by persons who are or may be under the domination of a foreign government or organizations controlling the world Communist movement.

■■ The second question is whether the inquiry being conducted by the Subcommittee of the Senate Judiciary Committee was authorized by the Resolution. According to the allegations of the indictment, which we must accept for purposes of the motion to dismiss, the inquiry was directed in part to the nature of the activities employed and in part to the extent to which agents of the world Communist movement may have worked through the Institute to the point where they exerted influence on the Far Eastern policy of the United States. An inquiry of the sort thus described was a natural and proper part of the inquiry which the Subcommittee was directed to make.

■ The third query is whether the question which is the subject of this Third Count was material to the inquiry. "Asiaticus" was the pen name for a writer who contributed to "Pacific Affairs". In view of the nature of the Institute and of its magazine, as an admitted source of scholarly matter on Asiatic problems, we cannot at the present juncture rule as a matter of law that it was not material to the study being made by the Subcommittee to inquire whether contributors to the magazine were or were not Communists. The duty of the Subcommittee embraced a complete study of the nature and extent of alleged infiltration by Communists. Whether the editor of a publication such as "Pacific Affairs" was conscious of the fact, if it was a fact, that a contributor of articles to the magazine was a Communist, might be shown

7. 83 U.S.App.D.C. 127, 167 F.2d 241 (1948), certiorari denied, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767 (1948).

8. Cf. Rumely v. United States, 90 U.S. App.D.C. 382, 197 F.2d 166 (1952), affirmed, 345 U.S. 41, 73 S.Ct. 543, 97 L. Ed. 770 (1953).

to be material to that inquiry, we think. Perhaps it was not important, but it was within the realm of materiality in so far as appears upon the face of the indictment. Of course, to obtain a conviction the Government must prove, in the trial court, materiality as an element of the offense.

It is suggested that the reporter's transcript of the hearings before the Subcommittee, from which these charges arose,[9] show the question in the Third Count to be immaterial. That transcript was not introduced in evidence in the trial court; in fact no evidence whatever has yet been taken. So far as appears from the record before us, no formal request that the trial court take judicial notice of the hearings was made or considered. The matter was before the trial court and is before us upon the indictment and the motion to dismiss.[10] Nevertheless the hearings have been cited and quoted in numerous ways. The indictment itself contains citations to the hearings. The motion to dismiss contained references to them, and the District Court made similar references and based many factual statements on them. The Government, in its Points and Authorities, filed March 17, 1953, in the District Court in Opposition to the Motion to Dismiss, not only referred to but quoted extensively from the hearings. In its brief in this court the Government strenuously opposes reference to the hearings, but it apparently limits its opposition to "matters evidentiary, which have no bearing upon the legal sufficiency of the indictment." In its reply to a memorandum filed in this court by appellee on January 28, 1954, the Government stresses its opposition to use of the hearings in respect to "controverted issues of fact".

█ We think it proper to draw from the hearings explanatory material

necessary to an understanding of terms and parts of the indictment. But we think it not permissible to refer to them for facts which may become issues upon the pleas and may be subject to dispute. The sole question upon this appeal is the validity of the indictment against a motion to dismiss. Upon such a motion the allegations of the indictment must be accepted as they are written. What they may turn out to be upon the trial, when the evidence is in, is another and different problem. For example, materiality upon the face of an indictment and materiality in the light of all the evidence may be critically different. At this present stage we must, as the Government contends, refrain from making, or appearing to make, factual findings outside those which bear upon the legal sufficiency of the indictment as returned by the grand jury. Some explanatory material is necessary to that purpose. We go no further than that. Of course, if the hearings were in the record in the trial court—as, for example, by affidavit in a motion for summary judgment, or by agreed formal judicial notice, or upon admission in evidence,—other problems might be presented. We think we should not go outside the record for facts other than mere clarifying references.

In this connection Lattimore cites United States v. Darby,[11] but that case deals with judicial notice of hearings forming part of the legislative history of a statute the meaning or validity of which is under scrutiny. That is not our present problem.

█ Lattimore says this count is invalid for vagueness, in that the word "Communist" has no certain meaning and so the meaning of neither the question nor the answer can be ascertained. He says that some eight months and 3,500 printed pages after the question

---

9. Hearings on Institute of Pacific Relations before Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws of the Committee on the Judiciary of the United States Senate, 82d Cong., 1st and 2d Sess. (1951–52).

10. Other motions were filed and passed upon but are not presently involved.

11. 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

and answer upon which this count is based, the committee members attempted unsuccessfully to reach a common understanding with him as to its meaning. As we have already pointed out, the transcript of the hearings is not in the court record; any defense based upon it must be by way of plea and proof. So far as the face of the indictment is concerned the question put to Lattimore was whether he knew something. Upon the face of it Lattimore understood the question. His alleged answer not only reflected an understanding of the term used by his questioner but indicated a specific and clearly defined understanding of it. Answering, he drew a line between a Socialist and a Communist, surely an act which would not be attempted except by one who thought he knew what the subject of the question was. It may be true that the word "Communist" may be used with different shades, gradations or variations of meaning, but all such are within a clearly established generic meaning. The word is not without a meaning which can be used with mutual understanding by a questioner and an answerer. The face of this indictment indicates that the term was so understood. If it was not so—if there was a misunderstanding between the two men—that fact should be asserted and shown as part of the defense. We cannot say that upon the face of this alleged question and answer the term used in the answer was too vague to put Lattimore to his defense as to its truth. After the evidence has been taken it may or may not appear that Lattimore understood the question when he answered that he would have thought Asiaticus was "possibly a Socialist, but not a Communist." But that situation is not before us.

In sum, then, upon Count III we are of opinion that this count was sufficiently certain to be valid, that the Senate Resolution was valid, and that the inquiry was authorized and the question cannot from the face of the indictment be held to be immaterial. We hold the count to be valid, and the order of the District Court in respect to it is reversed.

Judges Edgerton, Clark, Wilbur K. Miller, and Bazelon are of opinion that the order on Count III should be affirmed.

The pertinent part of the Fourth Count was that Lattimore testified falsely as follows:

"Mr. Morris. When you were editor of the publication 'Pacific Affairs' did you ever publish an article by a person whom you knew to be a Communist?

"Mr. Lattimore. Apart from Russian contributions, no.";

that "the aforesaid testimony of said defendant as he then and there well knew and believed, was untrue, in that said defendant had, when editor of 'Pacific Affairs', published articles (other than Russian contributions) by persons whom he knew to be Communists."

 What we have said in respect to the Third Count applies to the Fourth Count. We think this count is sufficiently certain and that, so far as appears from the face of the indictment, it was a valid and proper inquiry.

At the conclusion of oral argument in this court Lattimore added to his brief an insert to the effect that subsequent passages in the hearings show a total absence of perjury in this count. He says he had previously, in his initial statement to the Subcommittee, described a Chinese Communist contributor to "Pacific Affairs" and that after the answer quoted in the indictment he materially qualified that answer so as to correct an inadvertent error. He cites Meyers v. United States [12] and Fotie v. United States.[13] But those cases concerned convictions after trial, when the evidence was in. We think this issue is one of defense and should be considered when it has been raised by a plea and the evidence has been taken.

12. 84 U.S.App.D.C. 101, 171 F.2d 800, 11 A.L.R.2d 1 (1948), certiorari denied, 336 U.S. 912, 69 S.Ct. 602, 93 L.Ed. 1076 (1949).

13. 137 F.2d 831 (8th Cir.1943).

The order of the District Court in respect to this Count IV is reversed.

Judges Edgerton, Clark, Wilbur K. Miller, and Bazelon are of opinion that the order in respect to Count IV should be affirmed.

The Seventh Count of the indictment charged that Lattimore testified falsely as follows:

"Mr. Morris. And before you went beyond that line of demarcation, it would be necessary to have the Communist authorities' permission, isn't that right?

"Mr. Lattimore. No.

\* \* \* \* \* \*

"Mr. Morris. Is it your testimony that you or anybody in your party did not make any prearrangement with the Communist Party in order to get in?

"Mr. Lattimore: None whatever.";

that "the aforesaid testimony of said defendant, as he then and there well knew and believed, was untrue, in that before being received at Communist Headquarters in Yenan, said defendant and persons in his party had made prearrangements with the Communist authorities."

The United States, agreeing with the District Court, says this count charges Lattimore with lying when he denied arrangements with the Communist Party, the second portion of the testimony above quoted. That is to say, the alleged falsity does not lie in Lattimore's denial that it was necessary to make arrangements with the Communist authorities in order to cross the line of demarcation, but lies in his denial that arrangements were actually made with the Communist Party to get into Yenan.

We must look to the hearings to ascertain what the expression "line of demarcation" in this count means. The portion of the examination of Lattimore immediately preceding the quotation in this count began with a discussion of the ef-

forts of newspaper correspondents and others in the spring of 1937 to get into Yenan. Then the interrogator said, "You are going from Nationalist China to Communist China, and I presume there is a line of demarcation between the two." Lattimore said, "There was a line of demarcation between the City of Sian." [14] Then came the question first quoted in Count VII: "And before you went beyond that line of demarcation, it would be necessary to have the Communist authorities' permission, isn't that right?" Then followed questions and answers, indicated by asterisks in the indictment, referring to "government authorities" and the "Nationalist government", and immediately thereafter came the key question in this count: "Is it your testimony that you or anybody in your party did not make any prearrangement with the Communist Party to get in?"

It seems clear from this explanatory context that in the first question put to Lattimore, as quoted in this count of the indictment, the interrogator and he were talking about "Communist China" and had in mind Chinese Communist government authorities, as contrasted with the Chinese Nationalist government authorities. The interrogator then apparently changed the subject to "the Communist Party" and asked the question about arrangements with the Party. But the specification in the count alleged that the falsity of Lattimore's reply to that question is in the fact that before going to Yenan arrangements were made with "the Communist authorities". It seems clear to us that in this context "Communist authorities" and "the Communist Party" were two different things. That Lattimore made arrangements with "the Communist authorities", as that term had been used in the immediately preceding context, would not mean that he testified falsely when he answered that no arrangements had been made with "the Communist Party".

---

14. There must be some error in transcription in that sentence, because as it appears in the record it does not make complete sense.

We hold this count invalid because of a fatal variance in its terms. The order of the District Court in respect to this Count VII will be affirmed.

Chief Judge Stephens states his views on this count in the separate opinion filed with this one. Judge Danaher is of opinion that the order as to this count should be reversed. He feels that taken in context the substance of the question was, and was so understood to be, whether or not Communist leaders authorized or made prearrangements for the Lattimore trip into Communist China.

It is urged as a general contention in respect to the whole indictment that this prosecution impinges upon First Amendment rights. But clearly the freedom of speech to which the people protected their right by this clause in the Constitution does not include freedom to lie under oath. Even if Lattimore, as the editor of a publication, had a right not to speak,[15] he did not have a right to speak falsely. When he chose to speak under oath he was obliged to speak truly and was subject to the penalties of perjury if he lied on a material matter.

It is said that the atmosphere, manner and persistence of the examination of Lattimore by the Subcommittee were such as to void its validity. But the course of the hearings is not in the record in the present proceeding, as we have already noted.

The order of the District Court in respect to Counts I and VII is affirmed, and in respect to Counts III and IV it is reversed.

Affirmed in part and reversed in part.

STEPHENS, Chief Judge (concurring in part and dissenting in part).

For the reasons stated in the opinion of the court I conclude that Counts III and IV of the indictment are valid and that the decision of the District Court dismissing those counts should therefore be reversed. I agree that Count VII is invalid and that the decision of the District Court dismissing that count should therefore be affirmed, but I reach this conclusion for reasons other than those expressed in the opinion of the court. Contrary to the decision of the court, I think that Count I is valid and that the decision of the District Court dismissing that count should therefore be reversed.

## COUNT I

The validity of Count I is attacked by the appellee Lattimore on two chief grounds: That the count fails to satisfy the requirements of the Sixth Amendment and Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A.; and that the count infringes rights protected by the First Amendment.

**A. As to the attack under the Sixth Amendment:** That Amendment, so far as here pertinent, requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . .". Rule 7(c) of the Federal Rules of Criminal Procedure requires that "[t]he indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The gist of these requirements is that the indictment must set forth the offense not merely in generic terms but with such particularity as will apprise the accused of the elements of the crime with which he is charged so that he will be able to make his defense and avail himself of his conviction or acquittal for protection against being again put in jeopardy for the same offense; and that the charge must be sufficient to inform the court of the facts alleged so that it may decide whether they are sufficient in law. United States v. Cruikshank, et al., 92 U.S. 542, 23 L. Ed. 588 (1875).[1]

15. See Rumely v. United States, supra note 8.

1. In United States v. Cruikshank, et al. the Sixth Amendment guaranty under present discussion was construed as follows:

". . . In United States v. Mills, 7 Pet. [138] 142 [8 L.Ed. 636], this [Amend. VI] was construed to mean, that the indictment must set forth the offense 'with clearness and all necessary certainty, to

The District of Columbia Perjury Statute, D.C.Code 1951, § 22–2501, under which the indictment was returned, provides:

Every person who, having taken an oath or affirmation before a competent tribunal, officer, or person, in any case in which the law authorized such oath or affirmation to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed is true, wilfully and contrary to such oath or affirmation states or subscribes any material matter which he does not believe to be true, shall be guilty of perjury . . . ..

I set forth in the margin the full text of Count I.[2]

apprise the accused of the crime with which he stands charged;' and in United States v. Cook, 17 Wall. [168] 174 [21 L.Ed. 538], that 'every ingredient of which the offense is composed must be accurately and clearly alleged.' It is an elementary principle of criminal pleading, that where the definition of an offence, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms as in the definition; but it must state the species,—it must descend to particulars. 1 Arch.Cr.Pr. and Pl., 291. The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defence, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, facts are to be stated, not conclusions of law alone. A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances." [92 U.S. 558, 23 L.Ed. 588.]

The Cruikshank case involved an indictment under a statute providing for the punishment of those who conspire "to injure, oppress, threaten, or intimidate any citizen, with intent to prevent or hinder his free exercise and enjoyment of any right or privilege granted or secured to him by the Constitution or laws of the United States." Certain counts of the indictment charged, in substance, that the intent of the defendants was to hinder and prevent certain citizens of the United States in the free exercise and enjoyment of "every, each, all and singular" the rights granted them by the Constitution. There was no specification of any particular right. The Court held that because of this the counts in question were too vague and general, lacking the certainty and precision required by the established rules of criminal pleading and by the Sixth Amendment.

2. Count I of the indictment is in the following terms:

"The Grand Jury charges:

"1. On or about February 27, 1952, in the District of Columbia and within the jurisdiction of this Court, OWEN LATTIMORE, the defendant herein, having duly taken an oath before a competent tribunal, to wit, the Subcommittee to Investigate the Administration of the Internal Security Act and other Internal Security Laws, of the Committee on the Judiciary of the United States Senate, a duly created and authorized Subcommittee of the United States Senate conducting official hearings in the District of Columbia, and inquiring in a matter then and there pending before the said Subcommittee in which a law of the United States authorizes an oath to be administered, that he would testify truly, did unlawfully, wilfully and knowingly, and contrary to said oath, state a material matter which he did not believe to be true, that is to say:

"2. That at the time and place aforesaid, the said Senate Subcommittee, inquiring as aforesaid, was conducting a study and investigation of the administration, operation, and enforcement of laws, relating to espionage, sabotage, and the protection of the internal security of the United States, and of the extent, nature, and effects of subversive activities in the United States; including but not limited to the extent to which the Institute of Pacific Relations was infiltrated and influenced or controlled by agents of the Communist world movement; the extent to which these agents and their sympathizers worked through the Institute into the United States Government to the point where they exerted influence on the United States Far Eastern policy, and the extent to which they still exert such influence; and the extent to which such agents and their sympathizers misled' American public opinion, particularly with regard to Far Eastern policy.

"3. That it was material to the study and investigation to ascertain the extent to which the Institute of Pacific Relations had been infiltrated and influenced by agents of the Communist world move--

The attack of the appellee upon the count, so far as the Sixth Amendment, and Rule 7(c), are concerned, divides itself into two parts:

*First:* The count charges that "said defendant testified that he had never been a sympathizer or any other kind of promoter of Communism or Communist interests . . . [and that] the aforesaid testimony of that defendant, as he then and there well knew and believed, was untrue . . .." The appellee asserts that this language vitiates the count because the words "sympathizer or any other kind of promoter of Communism or Communist interests" are vague; that both the word "sympathizer," and the phrase "Communist interests," "defy analysis." It is said by the court that the word "sympathizer" lacks definition or any concrete specification of its content, that without this it has no certain meaning, and therefore the appellee is not definitely advised what he is charged with.

In my view these attacks upon the sufficiency of the count are not supportable for the reason that they mistakenly postulate an *objective* test of the meaning of the questioned words, when, plainly, under the statutory definition of perjury, and under the terms of the count—which exactly reflect the statutory definition—

the test of the meaning of the words charged as perjuriously uttered is *subjective.* The statute makes a person guilty of perjury who, having first "taken an oath . . . before a competent tribunal . . . that he will testify . . . truly, . . . wilfully and contrary to such oath . . . states . . . any material matter *which he does not believe to be true* . . .." (Emphasis supplied.) The general portion of the charge in paragraph 1 of the count asserts that the defendant stated "a material matter *which he did not believe to be true* . . .." (Emphasis supplied.) The particularization of the charge, in paragraphs 4 and 5 of the count, repeats the emphasized requirement of the statute. Clearly, in my view, what the defendant is charged with is falsely testifying "that he had never been a sympathizer or any other kind of promoter of Communism or Communist interests" in the sense in which *he* was using those words. Since, as I think, the words of the statute and of the count set up a *subjective* rather than an *objective* test of the meaning of the assertedly perjurious words, they are not indefinite, because assuming, as must be assumed in the present posture of the case,[3] that the defendant did utter the assertedly perjurious words, he must have known what he meant by them and must therefore now

ment and their sympathizers and the extent to which any of these persons had exerted influence on United States Far Eastern policy from posts they secured in the United States Government, or had influenced American public opinion with reference to said policy; and what participation in or knowledge of any such situation described above was had by Owen Lattimore, who had been an important figure in the Institute of Pacific Relations, and editor of one of its official publications, 'Pacific Affairs', and who had been an official of the United States Government; and it was further material to ascertain whether Lattimore himself had been a promoter of Communism or Communist interests.

"4. That at the time and place aforesaid, the defendant, OWEN LATTIMORE, duly appearing as a witness before the said Senate Subcommittee, and then and there being under oath as aforesaid, testified falsely before the said Senate Subcommittee with respect to the aforesaid material matter, to wit, said defendant testified that he had never been a sympathizer or any other kind of promoter of Communism or Communist interests. [Footnote omitted.]

"5. That the aforesaid testimony of that defendant, as he then and there well knew and believed, was untrue, in that said defendant had been a sympathizer and promoter of Communism and Communist interests. [22 D.C.Code 2501]"

3. It is elementary that on a motion to dismiss an indictment for failure to state a public offense the court must assume the truth of the facts charged. United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945); United States v. Cook, 17 Wall. 168, 21 L.Ed. 538 (U.S.1872); United States v. Jones, 207 F.2d 785 (5th Cir.1953).

know, in reading the charge of the indictment, what he is charged with. Under this charge, thus regarded, the Government would be obliged at the trial to sustain the burden of proving to the satisfaction of the jury beyond a reasonable doubt that the charged words were uttered by the appellee and that he did not believe them to be true in the sense in which he was using them. Whether that burden could be sustained is a question not now before the court. The court ought not speculatively to forecast that that burden is unsustainable. Evidence is imaginable which would support such a charge.[4]

In Seymour v. United States, 77 F.2d 577, 99 A.L.R. 880 (8th Cir.1935), Seymour had been convicted under a count charging perjury in a statement, before a Special Committee of the United States Senate, that he had "had no part in encouraging the candidacy of one George W. Norris of Broken Bow, Nebraska, for the Republican nomination for United States Senator from Nebraska, at the Primary election held the twelfth day of August, in the year nineteen hundred thirty." The prosecution was under a statute which, like the statute involved in the instant case, made it perjury to utter matter under oath which the utterer did not believe to be true.[5] The proof at the trial of the perjury charge consisted of a question put to, and an answer by, Seymour before the Special Committee as follows: "Q. 13. You had no part then, in view of what you have said, in encouraging the candidacy of George W. Norris, of Broken Bow? * * * A. Not a bit." After the evidence had been presented the court charged the jury as follows:

* * * "Then there may be instances where the questions are very plain, easily understood, simple in language, definite in meaning, and the answers may be very simple, the meaning of which is unmistakable. Then there may be instances where the questions are involved, or are long, or where unusual words are used, where the relationship of phrase to phrase and clause to clause may be such that there may be difficulty in gathering the exact scope and meaning of the question, and in all cases the answer has to be considered under the circumstances in which it is given. So also, an answer itself, may be involved and difficult to put in words or hard to understand. And we are not all alike; some have the gift of expression and clarity and others have difficulty in expressing themselves on any occasion and might have more difficulty when under oath and trying to be exact. I am stating this in calling your attention to the statute which says that you are to consider, in effect, *whether the testimony as given was believed to be true*, because the belief must be considered in view of the circumstances under which the person made the statement. Of course it is proper to consider the intelligence, the experience, the education, the understanding of the person who given [gives] the testimony and his comprehension of the questions asked him and his knowledge of the meaning of the words which he uses in giving his answers. But after considering all the circumstances, the final and legal test is not what the words might ordinarily mean, not what some one else claims they mean, not what the jury thinks the words mean, and not even the meaning which the words have as definited [defined] in the dictionary, although the ordinary meaning of such words is proper for you to consider in ascertaining the meaning which was used by the one giving the testimony. *But the test that you must consider and use, is whether or not the defendant believed the testimony as given was true at the time and in the sense that he understood the questions and in the sense he gave the answers constituting his testimony.*" [Emphasis supplied.] [77 F.2d 582]

Later in the charge the court told the jury:

. . . "In considering the meaning of the words as used you have a right to consider the common usage and meaning, or the various common meanings or usages of such words, and the more exact meaning as defined by the dictionary, but even after considering that, *still the test for you is, as I have said, to find out the meaning in which the defendant who gave the testimony intended in his answers and understood in the questions where such words were used.*" [Emphasis supplied.] [77 F.2d 582]

Again, the court instructed the jury:

. . . "I am not undertaking to bring to your attention the meaning of all the words in all of these questions and answers or all the statement in question but that when he made it he did not believe it to be true.

4. Suppose, for example, that the Government should have in its possession, and be able to authenticate and introduce in evidence, a statement by the appellee himself, made after the Subcommittee hearing, that he did at the hearing make

5. The indictment in Seymour v. United States was under 35 Stat. 1111 (1909), 18 U.S.C. § 231 (1946).

the meanings of those which might be considered ambiguous or indefinite, but I am trying to call to your attention the fact that it is for you to determine the meaning of the language and that if there is an ambiguity or indefiniteness in the meaning of the words used, that *it is for you to say the sense or meaning in which Mr. Seymour gave his testimony and the belief that he had as to the meaning of the words which were used in the questions and answers."* [Emphasis supplied.] [77 F.2d 583]

On appeal after his conviction Seymour contended that the word "encouraging" in the question above quoted was so uncertain that it called for "his opinion or construction as to its meaning" and that he had construed it as meaning "whether he had come into personal contact with Norris [of Broken Bow] or brought his personal influence to bear to persuade him to become a candidate" which he had not done and so answered. The court, affirming the judgment below, ruled as follows on that contention:

. . . It was certainly an open question for the jury to decide whether, after having just denied knowing or hearing Norris, appellant (who had actively co-operated to get Norris into the primary) did or could have thought that the question of whether he "had no part * * * in encouraging the candidacy" of

said Norris meant what he said he understood it to mean. [77 F.2d 584][6]

This decision by the Court of Appeals for the Eighth Circuit recognizes—by its affirmance of the conviction under the instructions given the jury—that where, under a perjury statute similar to D.C. Code § 22–2501, words used by a witness under oath are charged in an indictment to have been falsely uttered, the charge is in essence a charge that the words were false in the sense in which the witness used them. Thus the decision recognizes that the statutory test as to the meaning of the words is subjective, not objective.

*Second:* The appellee contends that the charge in Count I that he testified falsely that "he had *never* been a sympathizer or any other kind of promoter of Communism or Communist interests" (emphasis supplied) insufficiently advises him as to what, in his voluminous writings and lifetime contacts, is referred to as evidencing that he had been a sympathizer and promoter of Communism and Communist interests, and that he will by this "vagueness" be handi-

6. In Seymour v. United States it appeared that one W. M. Stebbins, a candidate in a Nebraska Republican primary for United States Senator against Senator George W. Norris of McCook, Nebraska, sought to aid his (Stebbins') candidacy by inducing a third candidate, a grocer's clerk of Broken Bow, Nebraska, named George W. Norris, to enter the race, the confusion of names to have the effect of injuring Senator Norris, who was well known in Nebraska, by drawing mistaken votes to the other George W. Norris. Seymour was called to testify before a Special Committee of the United States Senate investigating campaign expenses in connection with the selection of a United States Senator in Nebraska. He was thereafter charged with perjury in the statement described in the text, supra. The proof at the trial on the perjury charge consisted of the question and answer, quoted in the text, as follows: "Q. 13. You had no part then, in view of what you have said, in encouraging the candidacy of George W. Norris, of Broken Bow? * * * A. Not a bit." But this testimony before the Special Committee of the Senate had been immediately preceded by inquiries concern-

ing Norris of Broken Bow which had resulted in Seymour's testifying that he had never seen and never heard of Norris until he "saw his filing in the paper." His testimony was: "That as a representative of Stebbins he had gone to Kearney, Neb., for the purpose of 'getting Norris of Broken Bow to become a candidate' for Senator in the Republican primary; that he had there met one Johnson and given him $50 for this purpose (this amount being later repaid appellant by Stebbins); that later he transmitted to Johnson $300 and a Liberty bond for $500 given appellant by Stebbins for that purpose; that these payments were 'for campaign expenses of George W. Norris of Broken Bow.' " In affirming the conviction on the evidence just stated, and under the instructions given to the jury, as explained in the text, the Court of Appeals ruled that: "Obviously, the above evidence was ample to sustain a verdict that appellant knowingly swore falsely when, in answer to the question as to whether he had taken any part in 'encouraging the candidacy' of said Norris, he had answered, 'Not a bit.' "

capped in preparing his defense in the trial. In my view, this so-called vagueness in the count is not a lack of the particularity required by the Sixth Amendment and Rule 7(c) in apprising an accused of the elements of the crime with which he is charged. Comparison of the count with the perjury statute demonstrates that the count fully and definitely states each and all of the essential elements of the crime as defined by the statute. Paragraph 1 of the count describes the time and place of the alleged perjury, and the taking of an oath before a competent tribunal and the unlawful, wilful, and knowing violation of that oath by the statement of a material matter which the accused did not believe to be true. In the succeeding paragraphs this general charge is particularized by a description of the study and investigation being conducted by the Senate Subcommittee, by a statement of what was material to that study and investigation, and by a description of the testimony charged to be false.

The further information assertedly needed by the appellee for the preparation of his defense could be secured by a motion, under Rule 7(f) of the Federal Rules of Criminal Procedure, for a bill of particulars. A bill of particulars can not be used to cure the omission from an indictment of material averments; it can not, as it is sometimes said, "give life to what was dead when it left the grand jury." Foster v. United States, 253 F. 481, 484 (9th Cir.1918). Jarl v. United States, 19 F.2d 891 (8th Cir.1927). But, as said in Rinker v. United States, 151 F. 755, 759 (8th Cir.1907), in an opinion by Circuit Judge Van Devanter:

When an indictment sets forth the facts constituting the essential elements of the offense with such certainty that it cannot be pronounced ill upon motion to quash or demurrer, and yet is couched in such language that the accused is liable to be surprised by the production of evidence for which he is unprepared, he should, in advance of the trial, apply for a bill of the particulars; otherwise it may properly be assumed as against him that he is fully informed of the precise case which he must meet upon the trial. 1 Bishop's New Cr.Proc. § 643 et seq.; Wharton, Cr.Pl. & Pr. (9th Ed.) § 702 et seq.; Dunbar v. United States, 156 U.S. 185, 192, 15 S.Ct. 325, 39

L.Ed. 390; Rosen v. United States, 161 U.S. 29, 40, 16 S.Ct. 434, 480, 40 L.Ed. 606; Durland v. United States, 161 U.S. 306, 315, 16 S.Ct. 508, 40 L.Ed. 709; Dunlop v. United States, 165 U.S. 486, 491, 17 S.Ct. 375, 41 L. Ed. 799; United States v. Bennett, 24 Fed. Cas. 1,093, No. 14,571; Tubbs v. United States, 44 C.C.A. 357, 105 Fed. 59. . . .

See also Billingsley v. United States, 16 F.2d 754 (8th Cir.1926).

**B. As to the attack under the First Amendment:** That Amendment, so far as here pertinent, provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press . . . ." The appellee asserts that Count I charges him with matters relating to his attitudes, convictions, opinions, sympathies, and beliefs, and relating to his activities as an editor. This, the appellee urges, is improper in view of the quoted provision. Such a contention was rejected by this court in Barsky v. United States, 83 U.S.App.D.C. 127, 167 F.2d 241 (D.C.Cir.), certiorari denied, 334 U.S. 843, 68 S.Ct. 1511, 92 L.Ed. 1767 (1948), and in Lawson v. United States, 85 U.S.App.D.C. 167, 176 F.2d 49 (D.C.Cir.1949), certiorari denied, 339 U.S. 934, 70 S.Ct. 663, 94 L.Ed. 1352 (1950), ruling that Congress has power, notwithstanding the First Amendment, to inquire, incident to an investigation into Communist activities, into private beliefs and associations.

It is to be noted further in this connection that even if the appellee could have refused, under the protection of the First Amendment, to answer the questions asked him by the Subcommittee, nevertheless, having answered them, he can not rely upon the Amendment to escape the impact of a statute making it a crime to falsify a material statement before a competent tribunal after an oath to tell the truth. Cf. American Communications Association v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950), ruling that a statutory requirement—for the purpose of regulating interstate commerce, i. e., protecting it against disruptive strikes by unions whose management has been infiltrated by Communists—of the filing of non-Communist affidavits by union officers is not forbidden by the

First Amendment guaranty of freedom of speech. A contention similar to that of the appellee was made under the provision of the First Amendment that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ." and the contention rejected by the Supreme Court. Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878). In that case the Court ruled that a party's religious belief can not, because of the First Amendment, be used as justification for the commission of an overt act, to wit, bigamy, made criminal by a federal statute. Likewise, as is recognized in the opinion of this court, the First Amendment guaranty of freedom of speech and of the press is not a warrant for the commission of perjury.

## COUNT VII

As stated at the outset of this opinion, I conclude that Count VII is invalid, but for reasons other than those expressed in the opinion of the court.

The appellee asserts that this count lacks the definiteness required by the Sixth Amendment and Rule 7(c). The terms of the count, so far as here pertinent, are as follows:

\* \* \* \* \*

2. . . . [A]nd it was further material to ascertain the circumstances of the defendant's trip to and reception at Chinese Communist Headquarters at Yenan, China.
3. At the time and place aforesaid, Owen Lattimore, appearing as a witness under oath before said Senate Subcommittee, testified falsely with respect to the aforesaid material matter, as follows:
 "Mr. Morris: And before you went beyond that line of demarcation, it would be necessary to have the Communist authorities' permission, isn't that right?
 Mr. Lattimore: No.
 ⁂ \* ⁂ \* \*
 Mr. Morris: Is it your testimony that you or anybody in your party did not make any prearrangement with the Communist Party in order to get in?
 Mr. Lattimore: None whatever." . .
4. That the aforesaid testimony of said defendant, as he then and there well knew and believed, was untrue, in that before being re-

ceived at Communist Headquarters in Yenan, said defendant and persons in his party had made prearrangements with the Communist authorities. . . .

My reasons for concluding that the count is invalid are as follows: (a) It can reasonably be thought that the first question and answer in paragraph 3 of the count are but preliminary to the second question and answer; that the gist of the charge is falsity in the answer to the second question. The Government so contends. (b) But it may, with equal reason, be thought that the gist of the charge includes falsity in answering both the first question and the second question because in paragraph 4 of the count it is said that "the aforesaid testimony of said defendant, as he then and there well knew and believed, was untrue . . .." The phrase "the aforesaid testimony" is sufficiently broad to include the first question and answer as well as the second. (c) The count can also reasonably be thought to have the meaning attributed to it by Circuit Judge Danaher as that meaning is described in the opinion of the court, where it is said that in his view "taken in context the substance of the question [asked of the appellee] was, and was so understood to be, whether or not Communist leaders authorized or made prearrangements for the Lattimore trip into Communist China." Since the count is thus reasonably susceptible of any one of three different constructions, it does not satisfy the requirements of particularity and definiteness made by the Sixth Amendment and Rule 7(c).

A further ambiguity exists in the phrase "in order to get in" at the end of the second question. It is not clear from the face of the count whether this means to get beyond the line of demarcation referred to in the first question, or into the Chinese Communist Headquarters at Yenan referred to in the above quoted portion of paragraph 2 of the count.[7]

---

7. The reasons set forth in the text for my conclusion that Count VII is invalid are not urged by the appellee. His contention is that the count is indefinite because of the following: Paragraph 4 of the count charging that "the aforesaid testimony of said defendant, as he then and there well knew and believed, was

I would therefore, as stated at the outset of this opinion, reverse the decision of the District Court as to Counts I, III, and IV but affirm it as to Count VII.

EDGERTON, Circuit Judge, with whom Circuit Judges CLARK and BAZELON concur.

We think all four counts were rightly dismissed. Accordingly we concur in this court's result as to Counts I and VII but dissent as to Counts III and IV.

Asiaticus was the pen name of a contributor to the magazine "Pacific Affairs" which Lattimore edited from 1934 to 1941. Count III says Lattimore testified falsely that he "didn't know", in the late 1930's, that Asiaticus was a "Communist". Count IV says Lattimore testified falsely that he never published, while he was editor, an article by a non-Russian whom he knew to be a "Communist".[1] In our opinion these counts are void because they are vague and also because they concern immaterial matters.

## Vagueness of Counts III and IV.

Due process of law requires that a charge be definite enough so that a jury can understand it and the accused can prepare his defense. The Sixth Amendment requires that the accused "be informed of the nature and cause of the accusation".[2] Counts III and IV do not meet these requirements.

Count III calls for a jury's opinion as to whether Lattimore's opinion "in the late 1930's", as he remembered it, regarding the opinions of Asiaticus, was such that he "well knew" he testified falsely in saying he "didn't know" in the late 1930's that Asiaticus was a "Communist".

Whether it is vague or definite to say one "knows" something depends on what

---

[1] untrue . . ." is concluded by the assertion "in that before being received at Communist Headquarters in Yenan, said defendant and persons in his party had made prearrangements with the Communist authorities." The appellee contends that the reference to "Communist Headquarters in Yenan" is inconsistent with the reference to "line of demarcation" in the first of the two questions set forth in paragraph 3 of the count. The appellee contends also that the reference to "Communist authorities" in the concluding clause of the count is inconsistent with the reference to "Communist Party" in the second of the two questions. But these contentions of the appellee rest wholly upon the terms of the concluding clause. This clause is obviously but an assertion by the grand jury of what is the truth after the grand jury's description of the charged untruth. At the common law it was necessary in a perjury indictment not only to plead the charged falsity but also to plead the truth. Under modern pleading this is not required. Sharron v. United States, 11 F.2d 689 (2d Cir.1926). The final clause of paragraph 4 of the count should therefore be disregarded as surplusage. United States v. Remington, 191 F.2d 246 (2d Cir.1951), certiorari denied 343 U.S. 907, 72 S.Ct. 580, 96 L.Ed. 1325 (1952); United States v. Hiss, 185 F.2d 822 (2d Cir.1950), certiorari denied 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683 (1951). Since

the last clause is surplusage it can not serve as a predicate for an attack upon the count for indefiniteness. The accused must look for the gist of the charge at those portions of the count other than the last clause.

1. Shortly after Lattimore gave the testimony charged as perjury in Count IV, he told the Committee that his "memory had slipped a rather obvious cog" and pointed out that he had given the Committee a statement which referred to "'an article by a Chinese Communist which was clearly labeled as such and was presented as an example of what the Chinese Communists were saying.'" *Hearings*, 3146. Though this correction makes a valid conviction unlikely, it is not, we think, in itself a sufficient reason for dismissing Count IV. In United States v. Norris, 300 U.S. 564, 576, 57 S.Ct. 535, 540, 81 L.Ed. 808 (1937), the Court said: "the telling of a deliberate lie by a witness completes the crime defined by the law. This is not to say that the correction of an innocent mistake, or the elaboration of an incomplete answer, may not demonstrate that there was no willful intent to swear falsely."

2. Rule 7(c) of the Federal Rules of Criminal Procedure requires that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged."

one is said to know. That a watch cost $50, or was stolen, is definite enough. But a valid charge of perjury could not be framed on the theory that when a witness swore he did not know a watch was worth having, he did know it was worth having; or when he swore he did not know it was a long way from Washington to Baltimore, he did know it was a long way. The terms "worth having" and "a long way" are too vague.

Few terms are vaguer than "Communist". It may mean a member of the Communist Party, or a sympathizer and promoter of Communism and Communist interests, or a believer in dialectical materialism, or a radical, or an opponent of inherited wealth, or many other things. The court says, and we agree, that the term "sympathizer and promoter of Communism and Communist interests" in Count I makes that count void for vagueness. Since the word "Communist" incorporates that vagueness, and adds more, Count III is void for vagueness.

Count IV is like Count III in this respect.

## IMMATERIALITY OF COUNTS III AND IV.

Under the federal statute and also under the District of Columbia statute, perjury is "any material matter" falsely

sworn before "a competent tribunal". 18 U.S.C. (1952 ed.) § 1621, 62 Stat. 773; D.C.Code (1951) § 22–2501, 31 Stat. 1329. "And the materiality of what is falsely sworn, when an element in the crime of perjury, is [a question] for the court." Sinclair v. United States, 279 U.S. 263, 298, 49 S.Ct. 268, 273, 73 L.Ed. 692 (1929). When materiality is uncertain on the face of an indictment, the government may be able to prove materiality at a trial. But when on the face of the indictment it is plain that the testimony charged as perjury cannot be material, a demurrer should be sustained or the indictment dismissed.[3] We think this applies to Counts III and IV. Because of the period of time to which they relate, and also because of the subject to which they relate, we think they cannot be material to the investigation that the Committee was authorized to conduct.

I. *Disparity in time.* Counts III and IV relate to the period between 1934 and 1941. But the Committee[4] was authorized, at the end of 1950, to investigate current matters.

The Internal Security Act of 1950 became law September 23, 1950. 64 Stat. 987, 1031. Three months later, December 21, 1950, Senate Resolution 366, 81st Cong., 2d Sess., was passed.[5] The Reso-

---

3. United States v. Perdue, 4 F. 897 (D.C. W.D.Pa.1880); United States v. Pettus, 84 F. 791 (C.C.W.D.Tenn.1897); United States v. Bressi, 208 F. 369 (D.C.W.D. Wash.1913); United States v. Rhodes, 212 F. 518 (D.C.S.D.Ala.1913); United States v. Cameron, 282 F. 684 (D.C.D. Ariz.1922).

 Cf. United States v. Garvett, 35 F. Supp. 644 (D.C.E.D.Mich.1940).

4. The Internal Security Subcommittee of the Senate Committee on the Judiciary.

5. It recites that "Congress from time to time has enacted laws designed to protect the internal security of the United States from acts of espionage and sabotage and from infiltration by persons who seek to overthrow the Government of the United States by force and violence; * * * those who seek to evade such laws or to violate them with impunity *constantly seek to devise and do devise* clever and evasive means or tactics for such pur-

poses; * * * agents and dupes of the world Communist conspiracy have been and are engaged in activities (including the origination and dissemination of propaganda) designed and intended to bring such protective laws into disrepute or disfavor and to hamper or prevent effective administration and enforcement thereof; and * * * *it is vital to the internal security of the United States that the Congress maintain a continuous surveillance over the problems presented by such activity and over the administration and enforcement of such laws.*" Accordingly the Resolution authorizes and directs the Committee on the Judiciary, or a subcommittee, "to make a complete and *continuing study and investigation* of (1) the administration, operation, and enforcement of the Internal Security Act of 1950; (2) the administration, operation, and enforcement of other laws relating to espionage, sabotage, and

lution recites that "continuous surveillance" is "vital to the internal security of the United States". It directs the Committee to make a "continuing study and investigation"—not a historical study and investigation—of "the administration, operation, and enforcement" of the internal security laws and of "the extent, nature, and effects of subversive activities in the United States * * * including * * * espionage, sabotage, and infiltration by persons who are or may be" Communist-dominated. The Resolution expresses no interest in persons who *were, or may have been,* Communist-dominated years ago, when Hitler, not Russia, was threatening the world and many people were Communist sympathizers who are now anti-Communists. The Committee is to study what goes on in the 1950's, not what went on in the 1930's. It is to be a watchman, not a historian.

If the Resolution left this point in doubt, legislative history would remove the doubt.

Senator Eastland introduced the Resolution on behalf of Senators McCarran, O'Connor, Wiley, Ferguson, Jenner, and Langer. He said: "we feel that the Committee on the Judiciary * * * owes a duty to the Senate and to the people which cannot be fully discharged *unless the committee conducts a continuous study and investigation* of the operation of our laws relating to espionage, sabotage, and the protection of the internal security of the United States * * * I am convinced that we are confronted by a task which must be the

subject of continuous effort. If, Mr. President, it is sound for the Congress to set up watch-dog committees to maintain a surveillance over the operation of our programs of expenditures at home and abroad, it is equally sound to equip the Committee on the Judiciary to maintain a watchful eye over our program to protect the internal security of this country." Senator Eastland read a statement by Senator McCarran which said: "*Over the course of many years there have been accumulated by various committees of the Congress substantial quantities of information* respecting the scope and nature of the Communist fifth column in the United States, and the Congress has, from time to time, enacted laws which were designed to meet this threat. *The purpose of the Senate resolution is not to again marshal the factual material which has already been assembled and which demonstrates conclusively the deadly menace of the Communist fifth column* * * * One of the elementary truths respecting communism in the United States is that it is a dynamic movement which, with devilish cunning, constantly seeks new avenues of expression and escape from detection. * * * *We must be constantly alert to the new tactics which are being devised to evade our best legislative efforts. It is for this reason principally that the instant resolution has been presented to the Senate, so that the Congress and the people may constantly be informed of our progress in this fight.*" (Emphasis added.) [6]

Bowers v. United States, 92 U.S.App. D.C. 79, 202 F.2d 447 (D.C.Cir.1953),

---

the protection of the internal security of the United States; and (3) *the extent, nature, and effects of subversive activities in the United States,* its Territories and possessions, *including, but not limited to espionage, sabotage, and infiltration by persons who are or may be* under the domination of the foreign government or organization controlling the world Communist movement or any other movement seeking to overthrow the Government of the United States by force and violence." (Emphasis added.) 96 Cong.Rec. 15965.

6. Another sponsor of the Resolution, Senator Ferguson, said· "We have enacted

a law, the Internal Security Act of 1950, carefully designed to protect the Nation against the Communist conspiracy. *It is the proper and indispensable function of Congress at this moment to see that that act is vigorously and fairly enforced. It is, moreover, the proper and indispensable function of Congress at this moment to determine what further measures may be necessary* to protect the Nation's securities and liberties against the ravages of the Communist conspiracy. Both functions come within the province of the Senate Judiciary Committee. *To serve those ends a thorough and continuing investigation of*

applies here. A Special Committee to Investigate Organized Crime in Interstate Commerce was authorized to make "a full and complete study and investigation of whether organized crime utilizes the facilities of interstate commerce or otherwise operates in interstate commerce * * * and, if so, the manner and extent to which, and the identity of the persons, firms, or corporations by which such utilization is being made, what facilities are being used," etc. S. Res. 202, 81st Cong., 2d Sess.; 92 U.S. App.D.C. at 80, 202 F.2d at 448. Bowers refused, in 1951, to tell the Committee what his business had been in Chicago in 1927. He was convicted of contempt of Congress. We reversed the conviction. We said: "on its face, the question was not pertinent to [the authorized] inquiry, for we are unable to see how an investigation into the activities of organized crime in interstate commerce which was being conducted in 1951 would be furthered in any way by the subcommittee's knowledge of what business Bowers engaged in in Chicago some twenty-four years before." 92 U.S. App.D.C. at 81, 202 F.2d at 449. Since the question was not "pertinent", obviously it did not relate to a "material matter".

II. *Disparity in subject.* The particular subject to which Counts III and IV relate—Lattimore's knowledge or ignorance of the views of other persons between 1934 and 1941—is not within the Committee's competence. Paraphrasing what we said in Bowers, we are unable to see how a "continuing study and investigation", conducted in the

1950's, of subversive activities and the operation of the security laws, would be furthered in any way by the Committee's knowledge of what an editor did or did not know between 1934 and 1941 about the views of authors whose work he then published. It is impossible to find in the Senate Resolution any suggestion of an intention to authorize inquiry into that subject.

Even today it is not illegal to publish an article by a known Communist. It was not illegal between 1934 and 1941. Therefore the question whether Lattimore did so between 1934 and 1941 has no connection with the clauses of the Resolution that concern "administration, operation, and enforcement" of laws. For several reasons, the question has no connection with the clause of the Resolution that concerns "subversive activities".

(1) In June 1941 Germany attacked Russia. In December of that year Germany's ally attacked Pearl Harbor and the United States joined Russia in the war against Germany. In January, 1942, President Roosevelt wrote to Admiral Land, "I am still terribly disturbed about the fact that an adequate number of ships are not available for Russia. * * * This Government has made a firm pledge to Russia and we simply cannot go back on it. * * * You simply must find some ships that can be diverted at once for this Russian business." [7] The President "assured Stalin that there would be no relaxation of efforts to keep the shipments going to the Soviet Union." [8] In February, 1942, on the occasion of the 24th anniversary of the

the Communist conspiracy, and the effectiveness of our efforts to combat it, *is necessary. That is the purpose of this resolution.*" (Emphasis added.) **96** Cong.Rec. 15966 (Nov. 30, 1950).

In recommending that the Senate pass the Resolution, the Committee on the Judiciary said: " * * * The committee have considered and approve the several statements made respectively by sponsors of this resolution on the occasion of its introduction in the Senate." Report No. 2617 [To accompany S.Res. 366], 81st Cong., 2d Sess., Dec. 11, 1950.

Senator Hayden, in presenting the Rules Committee's favorable report on the Resolution as amended, said: "It relates to *a continuance of surveillance* of the infiltration of Communists into the United States." (Emphasis added.) **96** Cong.Rec. 16872 (1950).

**7.** Quoted in Robert E. Sherwood, Roosevelt and Hopkins, p. 496 (1948).

**8.** Robert E. Sherwood, Roosevelt and Hopkins, p. 496.

foundation of the Red Army, General MacArthur sent a message from his headquarters in the Philippines in which he said: "The world situation at the present time indicates that the hopes of civilization rest upon the worthy banners of the courageous Russian Army. * * *" [9]

During our alliance with the Communist world power, and before that alliance, there could be nothing "subversive" in publishing even articles showing sympathy for that power—which the indictment does not allege that Lattimore did—to say nothing of colorless articles whose authors happened to be Communists. What might be "subversive" now has nothing to do with the case. The prosecution cannot project the 1950's into the 1930's.

(2) Even today, just as the fact that a picture was painted by a known Communist would not make it subversive to exhibit the picture, the fact that an article was written by a known Communist would not make it subversive to publish the article. If anything can make it "subversive" to publish an article it is the article's content, not who wrote it. It cannot be subversive to publish an innocuous article even if a known Communist wrote it. Counts III and IV do not allege either that Lattimore published, or that he denied publishing, subversive articles. If these counts go to trial, and if the government offers to prove that Lattimore did publish "subversive" articles and also that their authors were Communists, it will remain immaterial whether or not Lattimore knew they were Communists.

(3) Since Pacific Affairs was a scholarly journal, it was Lattimore's business as its editor to see that it presented a wide range of expert opinion. Unbiased scholarship probably required and certainly permitted the occasional inclusion of an article by a known Communist expert among the 250 articles published between 1934 and 1941.

(4) Lattimore made clear to the Committee that articles by Russian Communist experts were acceptable but hard to get. (*Hearings*, 3248, 3321, 3438) So far as Count IV is concerned, therefore, his alleged false statement may be paraphrased; he did not know that some Communists whose articles he published were non-Russians. But whether Communists were Russians or not, and whether Lattimore knew it or not, could have nothing to do with the question whether the articles themselves, and Lattimore's activity in publishing them, were innocuous or subversive.

Since an editor of any political views, or none, might well have published articles by known Communists between 1934 and 1941, Lattimore's knowledge or ignorance of authors' views has nothing to do, directly or indirectly, with the subject of subversive activities, then or later. No testimony concerning his knowledge or ignorance could have any value, even as a lead to other testimony. Suppose he had answered that he *did know* that Pacific Affairs had non-Russian Communist contributors and that Asiaticus was one of them. This would not have increased the Committee's knowledge about the contributors. Neither would it have thrown light on the political connections or tendencies of Lattimore, the Institute, or the magazine.

III. *Meaning of "material"*. The court says the question whether an editor knew, in the 1930's, that a contributor was a Communist "Perhaps * * * was not important, but it was within the realm of materiality in so far as appears upon the face of the indictment."

The court overlooks the fact that in statutes, as well as in ordinary use, "material" means not only pertinent but also important in some substantial degree. [10]

9. Quoted in Robert E. Sherwood, Roosevelt and Hopkins, p. 497.

10. "* * * The improvements to which petitioners call our attention are in our judgment relatively too small and too brief to be 'material' within the meaning of Section 24(a). In other words, they do not seem to us to have any important bearing upon the Commission's conclu-

The perjury statute, which uses the word "material" while the contempt statute uses the word "pertinent", is no exception. It is one thing to say that if a committee were authorized to investigate pneumonia, the life-long clinical history of a man believed to have had pneumonia might be pertinent to the inquiry. It would be quite another thing to say that if he testified he had six colds in one winter ten years ago, whereas in fact he had only five, he could be indicted and punished for perjury.

In Pyle v. United States, 81 U.S.App. D.C. 209, 156 F.2d 852 (D.C.Cir.1946), the false testimony charged as perjury was, as we recognized, plainly pertinent. But it was unimportant, and we held it was therefore not material and did not support a conviction of perjury. We said: "Laubaugh was being tried for unlawfully transporting Shirley Shelton on August 29, 1944. The material fact in issue was whether he had so transported the Shelton girl. Mary Pyle testified against him, saying that he had transported Shirley; in that respect her testimony did not vary from her written statement of September 18, 1944. She is charged with perjury for having falsely testified that the written statement was involuntarily given. This false statement was not perjury unless it was somehow material to the issue as to the guilt or innocence of Laubaugh. The writing of September 18 charged him with guilt; consequently, Mary Pyle's statement from the witness stand that the writing was not given voluntarily would have been material to the issue as to Laubaugh's guilt, except for the fact that from the witness chair Mary charged him with guilt exactly as she had done in the writing. If, as a witness, she had repudiated the accusation of transporting Shirley which appeared in her written statement, then her testimony that she signed the writing because of the threats of the agents would have tended to reduce or minimize the government's case against Laubaugh; and her testimony that the writing was involuntarily signed, if proved false, would have amounted to perjury. But, as she repeated under oath what she had said in the September statement as to Laubaugh's guilt of transporting Shirley Shelton, her false statement that the writing was not voluntary could have had no effect on the jury's decision * *. It is our view, therefore, that the false statement attributed to the appellant was in no way material in the case in which she made it and did not constitute perjury within the meaning of the statute." 81 U.S.App.D.C. at 213, 156 F.2d at 856.[11]

The reason why the law restricts the crime of perjury to testimony of some importance before a "competent tribunal" is clear. Congress, the courts, and administrative bodies must not be misled, in their official action, by false

sions." Central & South West Utilities Co. v. Securities & Exchange Commission, 78 U.S.App.D.C. 37, 39, 136 F.2d 273, 275 (D.C.Cir.1943).

11. The rule that pertinence is not enough, and importance is necessary, to make testimony material for perjury purposes, is commonly expressed in terms of a tendency to influence action. In Robinson v. United States, 72 App.D.C. 254, 255, 114 F.2d 475, 476 (D.C.Cir.1940), a prosecution for perjury in making false statements in an application for a marriage license, we said the test "is whether such statements had a natural tendency to influence the clerk in his investigation of the facts, in the exercise of his official discretion, and in the administration of the law."

In United States v. Cameron, 282 F. 684 (D.C.D.Ariz.1922), a candidate for the Senate had filed under the Corrupt Practices Act of 1910 a sworn statement of campaign receipts and expenditures. An indictment charged that his statement of receipts was false. A demurrer was sustained, on the ground among others that although the Corrupt Practices Act *required a sworn statement* of both receipts and expenditures, it *penalized* only excessive expenditures; therefore the perjury indictment did not show that the "particulars as to which the oath is alleged to have been false were material in the essential sense required for the purposes of an indictment for this offense." 282 F. at 692.

testimony. But false testimony that is very unlikely to influence official action is little worse than ordinary lying.

IV. *Congressional power.* If there be doubt that Counts III and IV are void for the reasons we have discussed, the doubt should be resolved against the counts in order to avoid a grave constitutional question.

If we could not avoid the question, it might be hard to avoid the conclusion that a congressional inquiry into what an editor knew, between 1934 and 1941, about the views of the authors whose work he published, would abridge the freedom of the press guaranteed by the First Amendment. The Supreme Court's unanimous affirmance of our judgment in the Rumely case emphasizes the rule the Court established: that courts must not treat Congress as having meant to authorize a committee to ask questions that may invade First Amendment rights, unless Congress makes that meaning unmistakably clear. United States v. Rumely, 345 U.S. 41, 46, 73 S.Ct. 543, 97 L.Ed. 770 (1953). We have shown how far from clear it is that the Senate meant to authorize such an inquiry.

The Supreme Court said: "there is wide concern, both in and out of Congress, over some aspects of the exercise of the congressional power of investigation. * * * Surely it cannot be denied that giving the scope to the resolution for which the Government contends * * * raises doubts of constitutionality in view of the prohibition of the First Amendment." United States v. Rumely, 345 U.S. 41, 44, 46, 73 S.Ct. 543, 545, 97 L.Ed. 770. Our court had held that Congress could not require Rumely, a publisher, to identify the purchasers of books: "To publicize or to report to the Congress the names and addresses of purchasers of books, pamphlets and periodicals is a realistic interference with the publication and sale of those writings." We pointed out that the "effect of public embarrassment is a powerful interference with the free expression of views." Rumely v. United States, 90 U.S.App.D.C. 382, 390, 197 F.2d 166, 174 (D.C.Cir.1952). In the Supreme Court, likewise, Justice Douglas with whom Justice Black concurred held that Congress could not require a publisher to identify the purchasers of books. No member of the Supreme Court expressed a contrary view. But the majority of the Court affirmed our judgment on the ground that it was doubtful whether Congress could impose such a requirement and that the Court should therefore adopt a "strained" (345 U.S. at 47, 73 S.Ct. at 546) construction of congressional language rather than find that Congress undertook to impose it.[12]

It is doubtful, to say the least, whether the Senate could require an editor to tell what he knew between 1934 and 1941 about the views of authors whose work he published. More directly than the embarrassment of purchasers involved in the Rumely case, embarrassment of editors interferes with freedom of the press. It restricts not only reading but printing. And unlike Rumely, no strained construction of congressional language is necessary to keep the constitutional issue out of this case. On the contrary, a strained construction of congressional language would be necessary[13] to bring the constitutional issue into the case; for, as we have shown, the ordinary meaning of the Senate Resolution makes the matter in Counts III and IV immaterial and the counts therefore void.

In Rumely we distinguished the Barsky, Lawson, and other cases on the grounds that "Communism and the Communists are, in the current world situation, potential threats to the security of this country" and that Congress could, therefore, interfere with freedom of expression in order to inquire into the subject. 90 U.S.App.D.C. at 389, 197 F.2d

---

12. The concurring opinion of Justice Douglas shows that the construction of congressional language which the majority adopted was very strained.

13. It would also be necessary to overlook the vagueness of Counts III and IV.

at 173. For at least two reasons this distinction does not support Counts III and IV. First, the questions in Barsky, Lawson, etc., concerned objective facts and did not directly probe mental states. The Barsky defendants "were not asked to state their political opinions. They were asked to account for funds." [14] The Lawson defendants were asked about membership in the Communist Party and in the Screen Writers Guild.[15] Second, Counts III and IV relate exclusively to the time between 1934 and 1941, before the commencement of the "potential threats to the security of this country" with which Congress and the courts were concerned in Barsky and Lawson.[16]

Nothing in the opinion of the Supreme Court, or in the concurring opinion, in Rumely suggests that the case turned or might have turned on evidence introduced at Rumely's trial. Neither opinion mentions his trial, except to say he was convicted under R.S. § 102 [2 U.S.C.A. § 192] for refusal to testify and was sentenced to a fine of $1,000 and imprisonment for six months. As far as appears, everything in both opinions would have been equally apposite if the indictment had been before the Court on a motion to dismiss. In the present case it has been suggested that the government should be given an opportunity to prove, at a trial, that the matter in Counts III and IV is material. But we do not know that anyone has suggested what sort of testimony might possibly have that effect.

The court says: "freedom of speech * * * does not include freedom to lie under oath. Even if Lattimore, as the editor of a publication, had a right not to speak, he did not have a right to speak falsely. When he chose to speak under oath he was obliged to speak truly and was subject to the penalties of perjury if he lied on a material matter." The court overlooks the fact that what is not pertinent cannot be material and the Rumely rule that pertinence cannot be decided without regard to constitutional limits on congressional power. The court overlooks, also, the fact that perjury is limited to material matter falsely sworn before a "competent tribunal". Lying under oath before a tribunal that is not competent is not perjury. Christoffel v. United States, 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949). Within the limits of the Constitution and the Senate Resolution, the Committee was competent. But outside either limit, the Committee was no more "a competent tribunal" than the Tax Court of the United States would be competent to investigate an election.

WILBUR K. MILLER, Circuit Judge.

Being of the opinion that all four counts involved here should have been, as they were, dismissed by the District Court, I concur with the majority in their affirmance of the dismissal of Counts I and VII and dissent from their reversal of the dismissal of Counts III and IV. The questions which those counts charge Lattimore with having answered falsely were not pertinent to the inquiry and, in my view, cannot be made pertinent by the introduction of evidence at a trial. Bowers v. United States, 92 U.S.App.D.C. 79, 202 F.2d 447 (1953). Consequently, while I substantially agree with what Judge Edgerton says in his dissenting opinion under the heading "Disparity in time," I do not reach a consideration of the other points he makes.

14. Barsky v. United States, 83 U.S.App. D.C. 127, 130, 167 F.2d 241, 244 (D.C. Cir.1948).

15. Lawson v. United States, 85 U.S.App. D.C. 167, 168–169, 176 F.2d 49, 50–51 (D.C.Cir.1949).

16. These subsequent threats are irrelevant for the additional reasons discussed in part II of this opinion.